## State of Vermont v. William A. Jenne

[591 A.2d 85]

No. 89-409

Present: Allen, C.J., Gibson, Dooley and Morse, JJ., and Peck, J. (Ret.), Specially Assigned

Opinion Filed April 5, 1991

*William H. Sorrell,* Chittenden County State's Attorney, Burlington, and *Gary S. Kessler* and *Rosemary Hull,* Department of State's Attorneys, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.,* Defender General, and *William A. Nelson,* Appellate Attorney, Montpelier, for Defendant-Appellant.

**Gibson, J.** Pursuant to V.R.A.P. 5(b), defendant appeals from the trial court's denial of his motion to dismiss or, in the alternative, to strike the jury panel. We conclude that the jury-selection procedures in Chittenden County do not violate defendant's constitutional or statutory rights, and, accordingly, answer the question certified by the trial court in the negative.[1]

---

[1] The certified question is as follows:
Whether the jury-selection procedures in effect in Chittenden County violate the defendants' state and federal constitutional rights to impartial juries drawn from a fair cross section of the community; their right under the Vermont Constitution that great care be taken in the choice and return of jurors; and their rights, under the jury selection statutes and

## I.

Defendant is charged with causing bodily injury to another with a deadly weapon, in violation of 13 V.S.A. § 1024(a)(2). On April 26, 1989, he filed a pretrial motion to dismiss or, in the alternative, to strike the jury panel on grounds that Chittenden County's jury-selection process violates his rights under (1) the Sixth and Fourteenth Amendments to the United States Constitution, (2) Chapter I, Articles 7, 10 and 12, and Chapter II, §§ 28 and 38 of the Vermont Constitution, and (3) the jury-selection statutes (4 V.S.A. §§ 952–953) and jury-selection rules 1 and 3.

Evidentiary hearings were held on April 28, May 10 and 15, 1989. Based upon the evidence presented, the trial court made the following findings. A pool of 237 potential jurors was generated from voter registration and licensed drivers lists. Defendant's evidence drew statistical comparisons between the pool and Chittenden County's population with regard to age, occupation, marital status, and gender. Data on the jury pool were gathered from the returned juror questionnaires. The general population figures were derived from the 1980 census, updated where appropriate by reliable Department of Health estimates.

With regard to age, the following categories were used: 18 to 24; 25 to 34; 35 to 44; 45 to 54; 55 to 64; and 65 to 69. The trial court found that no significant statistical disparities exist for the age groupings between 25 and 64. Both the top and bottom age categories, however, were found to have sociologically significant statistical disparities: 3.6% of the county's population is in the 65-to-69 category, compared to 8.9% of the pool, an overrepresentation of 5.3%; in contrast, the 18-to-24 age grouping represents 24.1% of the county population, but only 12.7% of the pool, an underrepresentation of 11.4%. Nevertheless, the court concluded that insufficient evidence existed to warrant classifying any of the age categories as distinctive groups within the community.

With regard to occupation, the evidence was incomplete. Only 131 of the 237 people in the jury array reported their occupations in a manner useful to defendant's experts, and those occupations were organized into very broad categories. Significant

rules, to juries which are representative in terms of age, gender, occupation and economic status.

statistical disparities were nevertheless found in several categories. The managerial and administrative category represents 12.9% of the population, but 21.4% of the pool, an overrepresentation of 8.5%. Machine operators, fabricators, and laborers represent 13.5% of the county population, but 5.3% of the pool, an underrepresentation of 8.2%. The court concluded the disparities were of limited usefulness, however, because of the poor quality of the data and the very broad nature of the occupational categories. With respect to educational attainment, the trial court found no significant statistical disparities.

The trial court found statistical disparities with respect to marital status. Single people represent 33.9% of the population, but only 22.4% of the pool, an underrepresentation of 11.5%. Married people comprise 55.3% of the county population and 68.8% of the panel, an overrepresentation of 13.5%.[2] The trial court concluded, on the evidence presented, that these disparities would be sociologically significant only in a few "family-core" types of cases.

Finally, with regard to gender, 51.2% of the county is female, compared to 59.1% of the pool, an overrepresentation of 7.9%. In contrast, 48.8% of the county population is male, whereas 40.5% of the jury array is male, an underrepresentation of 8.3%. The trial court concluded that the statistical disparities for gender are sociologically significant.

Based upon these findings, the trial court held that (1) the proposed categories for age, occupation, and marital status do not constitute "distinctive groups," (2) gender is a "distinctive group," but the disparities were not sufficient to preclude a "fair and reasonable" representation and there was no "systematic exclusion" of males or females from voters or drivers lists, and (3) 4 V.S.A. § 953(a) was not violated because this was the first jury chosen from a new jury pool combining both drivers' license and voter registration lists. The trial court subsequently granted defendant's motion for permission to file an interlocutory appeal, pursuant to V.R.A.P. 5(b).

---

[2] The county population data for single and married people total 89.2%, leaving 10.8% of the population as unknown. Similarly, the total of single and married for the panel is 91.2%, leaving 8.8% unaccounted for. At oral argument, defense counsel suggested that the difference is comprised of divorced individuals. While this percentage of divorced people strikes us as small, the disposition of the case is not affected.

On appeal, defendant argues (1) that his rights under the Sixth Amendment and the Vermont Constitution to a jury drawn from a fair cross-section of the community are violated by the underrepresentation of young people, blue-collar workers and less-well-educated individuals, single people, and males; (2) that the evidence establishes a failure to take great care to avoid jury partiality, in violation of the Vermont Constitution, Chapter II, § 38; and (3) that the underrepresentation of young people violates his rights under Vermont's jury-selection statutes.[3] We address defendant's arguments seriatim. Initially, however, we must address the propriety of the interlocutory appeal.

## II.

The instant case is one of forty-four that were under appeal simultaneously. All of them present the same certified question. On our own motion, we dismissed the other forty-three on grounds that a decision on the question presented would not materially advance termination of the litigation. See V.R.A.P. 5(b)(3). We denied the State's subsequent motion to dismiss this case, however. In its brief, the State renews its argument that interlocutory appeal is inappropriate herein.

> Under Rule 5(b), the defendant must show three elements to obtain an interlocutory appeal: (1) the ruling to be appealed must involve a controlling question of law; (2) there must be a substantial ground for difference of opinion on that question of law; and (3) an immediate appeal must materially advance the termination of the litigation.

*State v. Wheel*, 148 Vt. 439, 440, 535 A.2d 328, 329 (1987). In *State v. Pelican*, 154 Vt. 496, 580 A.2d 942 (1990), we addressed whether interlocutory appeal of a pretrial challenge to a jury array was appropriate, and when the State failed to brief the issue, concluded that the trial court had not abused its discretion in granting the defendant permission to appeal. *Id.* at 501–02, 580 A.2d at 946. In the instant case, the State has briefed and argued the issue. Although we question whether any of the

---

[3] At oral argument, defendant also requested that we reconsider and overrule *State v. Pelican*, 154 Vt. 496, 580 A.2d 942 (1990). We decline to do so and, instead, expressly reaffirm our holdings therein.

three requirements for interlocutory appeal have been established by defendant, this is one of many cases challenging Chittenden County's jury-selection procedures, the merits have been fully briefed and argued, and the relevant facts underlying the appeal are not subject to change at trial. Thus, the dispute will not go away, and it would not serve the interests of judicial economy to dismiss the appeal as improvidently granted, thereby requiring the Court and counsel to prepare for argument again at some future time. See *Castle v. Sherburne Corp.*, 141 Vt. 157, 165, 446 A.2d 350, 354 (1982) (suspending requirements for interlocutory appeal of a discovery order pursuant to V.R.A.P. 2 in interests of judicial economy). We therefore suspend the rule and decline to dismiss the appeal. V.R.A.P. 2; *Castle*, 141 Vt. at 165, 446 A.2d at 354.

## III.

The Sixth Amendment guarantees defendant, through the Fourteenth Amendment, an impartial jury. *Pelican*, 154 Vt. at 502, 580 A.2d at 946. "[T]he impartial jury requirement is met only when jury venires are drawn from a fair cross section of the community." *Id.* The jury does not, however, need to be "a statistical mirror of the community." *Id.* Instead, to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement, defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). In *Pelican*, we adopted the following three-prong test to determine whether a group is within *Duren*'s "distinctive" group requirement:

> (1) the group must be defined and limited by some clearly identifiable factor (such as race or sex), (2) there must be a common thread or basic similarity in attitude, ideas or experience which runs through members of the group, and (3) there must be a community of interest among the members of the group to the extent that the group's interest cannot

be adequately represented if the group is excluded from the jury selection process.

*Pelican*, 154 Vt. at 503, 580 A.2d at 947. Whether a class or group is "distinct" is a question of fact. *Id*. We will defer to the trial court's finding unless it is clearly erroneous. See *id*. at 504, 580 A.2d at 947–48.

■ Vermont's constitutional guarantee to a fair cross-section, pursuant to Chapter I, Articles 10 and 12, does not, in this case, provide any greater protection than that afforded by the federal constitution.[4] We have previously held that Articles 10 and 12 generally contain no greater rights than the Sixth Amendment. See *Pelican*, 154 Vt. at 509, 580 A.2d at 950. The Vermont Constitution also requires a defendant to show prejudice in order to successfully challenge a jury array. *Id*. Having reviewed the record, we perceive no prejudice and, indeed, defendant does not show or argue how he is prejudiced. Although our analysis of the Vermont constitutional claims could end here, see *id*. at 510, 580 A.2d at 950, we also conclude defendant has failed to establish a prima facie violation of his fair-cross-section rights.

■ We first turn to defendant's contention that the under-representation of young people on the jury panel violates his fair-cross-section rights. The same argument was presented in *Pelican*, where we concluded the trial court was clearly erroneous in finding young adults a distinctive group. *Id*. at 506, 580 A.2d at 948. We did, however, add a caveat: "[W]e cannot say that an age-defined group can *never* be found to be distinctive." *Id*. at 505, 580 A.2d at 948 (emphasis in original). In the instant case, the trial court concluded that young people do not constitute a distinctive group. After reviewing the evidence, we conclude that the finding is not clearly erroneous.

■ Defendant next argues that overrepresentation of middle-class individuals results in an underrepresentation of other

---

[4] Article 10 provides in pertinent part "[t]hat in all prosecutions for criminal offenses, a person hath a right to . . . trial by an impartial jury of the country . . . ."

Article 12 provides "[t]hat when any issue in fact, proper for the cognizance of a jury is joined in a court of law, the parties have a right to trial by jury, which ought to be held sacred."

cognizable groups, citing to *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 223-24 (1946) (daily wage earners), and *United States v. Butera*, 420 F.2d 564, 571 (1st Cir. 1970) (educational attainment).[5] The same argument was made in *Anaya v. Hansen*, 781 F.2d 1, 3 (1st Cir. 1986). *Anaya* held that blue-collar workers and less-well-educated individuals are not distinct groups, reasoning that showings of mere statistical imbalances are insufficient for groups this diverse, and that cognizability has traditionally been limited to "*special* groups, like women and blacks, that have been subjected to discrimination and prejudice within the community." *Id.* at 6, 8 (emphasis in original). We agree and therefore reject defendant's argument.

■ Defendant contends that married, as opposed to single, individuals constitute a distinct group. The trial court disagreed, with the possible exception of a few "family-core" type cases, an undefined category not implicated by defendant's case. Initially, we note that neither the defendant nor our own independent research has revealed a case addressing whether single or married individuals are a distinct group. But none of the three criteria for determining whether a group is distinctive are met herein. First, married or single individuals are not defined by clearly identifiable factors equivalent to race or gender, the two examples we used in *Pelican*. See *Pelican*, 154 Vt. at 503, 580 A.2d at 947. Second, there was not sufficient evidence to establish a basic similarity of attitude, ideas, or experience for each group. Finally, defendant has shown no community of interest so intrinsic to these categories that the group's interest cannot be adequately represented if it is underrepresented. Thus, we cannot conclude that the trial court's finding was clearly erroneous. In any event, as we discuss subsequently with regard to gender disparities, defendant has failed to establish a "systematic exclusion," *Duren*'s third prong.

■ ■ With respect to gender, defendant argues that the trial court incorrectly required him to establish a reason for the statistical disparities disclosed by his evidence.[6] Given a facially

---

[5] We note that *Butera* was overruled in *Barber v. Ponte*, 772 F.2d 982, 996 (1st Cir. 1985).

[6] The trial court held that, although a close question, the gender disparities

neutral jury-selection method, in order to show a "systematic exclusion" pursuant to *Duren*, defendant must identify an aspect of the system "'that is: (1) the probable cause of the disparity, and (2) constitutionally impermissible.'" *People v. Sanders*, 51 Cal. 3d 471, 492, 797 P.2d 561, 570, 273 Cal. Rptr. 537, 546 (1990) (quoting *People v. Bell*, 49 Cal. 3d 502, 524, 778 P.2d 129, 140, 262 Cal. Rptr. 1, 12 (1989)), *petition for cert. filed* Feb. 26, 1991. The Sixth Circuit stated in *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir.), *cert. denied*, 488 U.S. 928 (1988), "that the selection of jurors from a neutral master list, without more, [could not] be construed as 'systematic exclusion' as defined in *Duren* merely because the percentage of women selected does not precisely mirror the percentage of women in the entire community." Similarly, Chittenden County selects jurors randomly from a neutral list. Thus, the trial court correctly held that defendant failed to establish systematic exclusion of one gender when he did not introduce any evidence indicating that the jury commissioner "utilized a particular system or procedure in order to exclude [a particular gender]." *Ford*, 841 F.2d at 685.

## IV.

■■■ Defendant argues that the responsible officials failed to exercise "great care," as required by Chapter II, § 38 of Vermont's Constitution.[7] Section 38 guarantees defendant impartial and competent jurors, *Pelican*, 154 Vt. at 510, 580 A.2d at

---

did not affront *Duren*'s second (fair representation) and third (systematic exclusion) prongs. Preliminarily, the court concluded that genders are distinct groups, *Duren*'s first prong. Because we conclude that there has been no systematic exclusion, we need not, and do not, express an opinion on the trial court's resolution of either the distinctive-group or fair-representation prongs. We note, however, that neither party takes issue with the trial court's handling of the distinctive-group prong, although all the cases cited by the parties and the trial court involve underrepresentation of women whereas, in the instant case, women are overrepresented.

[7] Section 38 provides:

Trials of issues, proper for the cognizance of a Jury as established by law or by judicial rules adopted by the Supreme Court not inconsistent with law, in the Supreme Court, the Superior Court and other subordinate courts, shall be by Jury, except where parties otherwise agree; and great care ought to be taken to prevent corruption or partiality in the choice and return, or appointment of Juries.

951, but does not guarantee defendant a representative jury. *Id.* Additionally, defendant must demonstrate prejudice in order to mount a successful challenge pursuant to § 38. *Id.* at 509, 580 A.2d at 950. In the instant case, defendant has failed to allege, let alone show, that he has been prejudiced and, in any event, he "has not argued that his jury will be either impartial or incompetent. He has no claim under Chapter II, § 38." *Id.* at 510, 580 A.2d at 951.

## V.

Defendant argues that the degree of underrepresentation of young people violates the standards set forth in 4 V.S.A. § 952[8] and § 953(a).[9] Defendant has not demonstrated prejudice and, in any event, this same argument was rejected in *Pelican.* 154 Vt. at 511, 580 A.2d at 951. The slightly greater statistical disparity, in the instant case, is insufficient to distinguish *Pelican*; we accordingly reject defendant's argument. See *id.*

*The certified question is answered in the negative. Remanded.*

---

[8] 4 V.S.A. § 952 provides:

The court administrator, subject to the approval of the supreme court, shall make rules regarding the qualifications, lists and selection of all jurors and prepare questionnaires for prospective jurors. Each jury commission shall, in conformity with said rules, prepare a list of jurors from residents of its county. The rules shall be designed to assure that the list of jurors prepared by the jury commission shall be representative of the citizens of its county in terms of age, sex, occupation, economic status, and geographical distribution.

[9] 4 V.S.A. § 953(a) provides:

(a) The jury commission, in order to ascertain names of persons eligible as jurors, may consult the latest census enumeration, the latest published city, town or village telephone or other directory, the listers' records, the election records and any other general source of names. There shall be continuous research for persons qualified and liable for jury service, in order to obtain as many prospective jurors as necessary and in order to limit as much as possible repetition of jury service. No person's name shall be placed on venire to serve in any state court of the state of Vermont more than once in any two-year period.