2005 VT 134

# State of Vermont v. Douglas Provost

[896 A.2d 55]

No. 04-160

Present: Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed December 23, 2005
Motion for Reargument Denied February 6, 2006

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Johnson, J.** Defendant Douglas Provost appeals his conviction on four counts of first-degree murder and his sentence of four consecutive terms of life without parole. Defendant argues that the trial court erred by (1) failing to suppress defendant's statement to the police pursuant to the Public Defender Act; (2) permitting the State's medical expert to testify regarding matters outside the scope of the expert's report; and (3) enhancing his sentence to life without parole based on constitutionally impermissible factors. We affirm defendant's conviction, but we vacate his sentence. Defendant's sentence will be four terms of imprisonment for life with minimum terms of thirty-five years, to be served consecutively.

¶ 2. On Friday night, July 13, 2001, defendant shot and killed four people inside a house in Belvidere, Vermont. Mitchell Bishop, his wife, Melissa Bishop, and their two daughters, Angel and Jessica Bishop, lived in the house, along with Jessica's fiancé, George Weatherwax, and Angel's boyfriend, Christopher Bocash. Deric Davis, a local college student, and his girlfriend, Lauren Ursitti, lived in an apartment on the same property. At the time of the shooting, defendant, Mitchell Bishop, Melissa Bishop, and Deric Davis were sitting in the living room. Defendant was attempting to sell his handgun to Mitchell Bishop in exchange for cash and a bag of marijuana. When Mitchell Bishop refused defendant's offer, and everyone but defendant began to leave the room, defendant suddenly pointed his gun at the chest of Deric Davis and shot him at close range. Defendant then shot Mitchell Bishop. Melissa Bishop ran out the door. Jessica Bishop and George Weatherwax, who had been upstairs, came downstairs in response to the gunshots, and defendant shot them both. Defendant drove away in his car as Melissa Bishop arrived at a neighbor's house and called the police. Christopher Bocash heard the shootings and described them to the

police when they arrived. Both Lauren Ursitti and Angel Bishop slept through the shootings.

¶ 3. Melissa Bishop described defendant's vehicle, which she had seen driving away from the scene on Route 109. A state police officer stopped defendant's vehicle on Route 109 and recorded his conversation with defendant, who denied any involvement with the shootings. The officer arrived at the Bishop home and showed the videotape to Melissa Bishop, who confirmed that defendant was the shooter. Police officers then went to defendant's home and observed it until the next morning, Saturday, July 14. When defendant's mother came outside, the officers asked her to ask defendant to step outside. When he did, the officers identified themselves and asked him to assist with an investigation, which he agreed to do. The officers then took defendant to the state police barracks in St. Albans.

¶ 4. After arriving at the barracks, defendant was advised of his *Miranda* rights, which he waived in writing. Between 8:30 a.m. and noon, the officers questioned defendant about the shootings. Defendant denied involvement with the shootings, then stopped answering the officers' questions. After continuing to ask defendant about the shootings without response for an extensive period, one of the officers stated that defendant appeared not to want to talk to them anymore, at which point defendant nodded. The officers ceased questioning defendant and placed him under arrest, whereupon defendant was taken to the correctional center in St. Albans. Later in the afternoon on the same day, officers approached defendant and asked if he had anything further to say, and defendant replied that he did not. Because it was a Saturday, the police also contacted Judge Burgess so that he could set bail by telephone pursuant to Vermont Rule of Criminal Procedure 5(b).[1] Judge Burgess ordered

---

[1] Rule 5(b) states:

> The judge of each territorial unit of the District Court shall establish procedures and standards by which persons arrested with or without warrant other than during normal business hours may be released pending appearance under this rule. The procedures shall provide for setting conditions of release at any hour. Each court shall maintain a schedule that provides which judge, clerk or designee is available to set conditions of release on each date. The appearance of a person released under this subdivision shall be held as soon as possible after release.

defendant held without bail pending arraignment on Monday, July 16.

¶ 5. On Sunday, July 15, the day following defendant's arrest, the officers returned to the correctional center and asked to speak with defendant again. Defendant agreed to speak with the officers and signed a second waiver of his *Miranda* rights.[2] During this interview, defendant admitted shooting all four victims. Defendant claimed that his gun fired accidentally and hit Deric Davis, and that he shot Mitchell Bishop in self-defense. Defendant said that he shot Jessica Bishop and George Weatherwax because he thought Deric Davis and Mitchell Bishop were still coming after him as he ran for the door. Prior to trial, defendant moved to suppress this statement, asserting violations of his rights under *Miranda* and the Public Defender Act. The trial court denied the motion, and the statement was admitted at trial. Defendant's eight-day jury trial included the statement and eyewitness testimony, as well as expert testimony as to whether the gun could have fired accidentally and whether the positioning of the victims' bodies was consistent with defendant's statement. The jury convicted defendant on four counts of murder in the first degree, and the trial court sentenced him to four consecutive terms of life without parole.

I.

¶ 6. Defendant first contends that the trial court erred in failing to suppress, pursuant to Vermont's Public Defender Act, the statement he gave on Sunday, July 15, the day after his arrest. Defendant

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), requires law enforcement officers to warn a person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Here, defendant signed a form acknowledging that he was aware of each of these rights and indicated his awareness next to individual warnings reading:

1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer before questioning and to have a lawyer present with you during questioning.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense, before any questioning, if you wish. In Vermont, that is called a Public Defender.
5. If you decide to answer questions, you may stop the questioning at any time.

argues that (1) the officers who detained and questioned him failed to contact a public defender on his behalf; and (2) Judge Burgess failed to inform defendant of his rights under the Act when he denied bail by telephone. We review de novo the trial court's conclusions of law on motions to suppress. *State v. Rheaume*, 2004 VT 35, ¶ 8, 176 Vt. 413, 853 A.2d 1259. We agree with the trial court's conclusions that defendant waived his right to have an attorney present during questioning and that this waiver was still in effect at the time he gave his statement.

¶ 7. Under the Public Defender Act, 13 V.S.A. §§ 5201-5277, needy individuals detained by law enforcement officers are entitled to have an attorney present during questioning. 13 V.S.A. § 5231(1). In addition,

> [i]f the person detained or charged does not have an attorney and does not knowingly, voluntarily and intelligently waive his right to have an attorney when detained or charged, [law enforcement officers shall] notify the appropriate public defender that he is not so represented. This shall be done upon commencement of detention, formal charge, or post-conviction proceeding . . . .

*Id.* § 5234(a)(2). Section 5234(a)(2) required the officers to contact a public defender on defendant's behalf when he was detained unless he waived his right to counsel. Defendant concedes that he waived that right by signing a *Miranda* waiver prior to his interview with police on July 14, the morning after the shootings. A waiver of the right to counsel under *Miranda* also serves as a valid waiver of counsel under § 5234(a). *State v. Caron*, 155 Vt. 492, 510, 586 A.2d 1127, 1137-38 (1990). Section 5234(a), rather than establishing a set of substantive rights in addition to the *Miranda* right to have counsel present at questioning, "recognizes *Miranda*'s concern for bad faith interrogation of individuals accused of a crime without the presence of counsel, and reflects this state's policy of securing for those individuals an immediate right to counsel." *State v. Picknell*, 142 Vt. 215, 224, 454 A.2d 711, 715 (1982). Defendant does not deny that he waived his right to counsel prior to the first interview. Instead, he argues that he revoked his *Miranda* waiver when he "became silent and verbally unresponsive" over the course of the first interview, then nodded when one of the officers stated that he appeared not to want to talk anymore. See *Miranda*, 384 U.S. at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to

remain silent, the interrogation must cease."). Defendant asserts that through this alleged revocation of his waiver of the right to remain silent, he also revoked his waiver of his Public Defender Act rights, which, in turn, required the officers to contact a public defender on his behalf.

¶ 8. Defendant's actions, however, even assuming they revoked his waiver of the right to remain silent, did not revoke his waiver of the right to counsel, and, therefore, did not implicate § 5234(a)(2). See *Picknell*, 142 Vt. at 224, 454 A.2d at 715 (identifying "securing . . . an immediate right to counsel" as the purpose of § 5234(a), without mentioning the right to remain silent). Because the Public Defender Act provides "no greater right to counsel to a needy person than to any other individual," *State v. Parizo*, 163 Vt. 103, 107, 655 A.2d 716, 718 (1994), and a valid waiver of counsel under *Miranda* also waives a detainee's rights under § 5234(a), *Caron*, 155 Vt. at 510, 586 A.2d at 1137-38, the question of whether defendant revoked his waiver of counsel is the same under *Miranda* and § 5234(a). For *Miranda* purposes, the United States Supreme Court has drawn a distinction between invocations of the right to remain silent and the right to counsel. See *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that while police may reinitiate questioning after a detainee has asserted only the right to remain silent, an invocation of the right to counsel automatically ends all questioning until an attorney is present); *Michigan v. Mosley*, 423 U.S. 96, 104 n.10 (1975) ("*Miranda* . . . distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.'" (quoting *Miranda*, 384 U.S. at 474)). *Edwards* and *Mosley* indicate that refusing to answer further questions does not automatically revoke a waiver of the right to counsel; otherwise, police could not reinitiate questioning outside the presence of counsel after such a refusal. Here, defendant waived his right to counsel on the morning after the shootings, and his refusal to continue talking to police later that morning was not a revocation of that waiver. A valid waiver of counsel was thus in effect throughout defendant's detention under both *Miranda* and the Public Defender Act, and there was no point at which officers were required to contact a public defender on defendant's behalf pursuant to § 5234(a)(2).

■ ¶ 9. Defendant also alleges that his rights under the Public Defender Act were violated when Judge Burgess denied bail by telephone without informing defendant of his right to representation at public expense. After a person has been detained or charged with a crime, the Act requires that "[u]pon commencement of any later judicial proceeding relating to the same matter, the presiding officer shall clearly inform the person so detained or charged of the right of a needy person to be represented by an attorney at public expense." 13 V.S.A. § 5234(b). We hold that the setting of bail by telephone is not the type of "later judicial proceeding" contemplated by the Act. Section 5234(b) protects a defendant's right to counsel during a criminal prosecution, regardless of financial need, which "attaches upon formal charge, preliminary hearing, indictment, information or arraignment, because these mark the beginnings of a criminal proceeding." *Parizo*, 163 Vt. at 106, 655 A.2d at 717 (quotations omitted).[3] In contrast to the formal proceedings listed in *Parizo*, the setting of bail by telephone is a decidedly informal function, designed by the Legislature to ensure that individuals who are arrested at night or on weekends are detained no longer than necessary. Reporter's Notes, V.R.Cr.P. 5(b). This is best demonstrated by the fact that Rule 5(b) allows the setting of bail not only by judges, but also by whichever "clerk or designee is available to set conditions of release" at that particular time. V.R.Cr.P. 5(b). The "later judicial proceeding" at which defendant was entitled to renewed notice of his right to representation at public expense was thus not the telephone conversation through which Judge Burgess ordered him temporarily held without bail, but rather his formal arraignment on Monday, July 16. The officers observed defendant's rights under the Public Defender Act, and we therefore affirm the trial court's refusal to suppress defendant's July 15 statement.

---

[3] The right to counsel during criminal prosecutions, which is protected by the Sixth Amendment to the federal Constitution and Chapter I, Article 10 of the Vermont Constitution, is distinct from the *Miranda* right to counsel during questioning. See *State v. Stanislaw*, 153 Vt. 517, 531, 573 A.2d 286, 294 (1990) ("[T]he protections of the Sixth Amendment right to counsel do not apply to 'interrogation sessions that . . . [take] place *before* the initiation of "adversary judicial proceedings."'" (quoting *Moran v. Burbine*, 475 U.S. 412, 428 (1986))); see also *Parizo*, 163 Vt. at 105-06, 655 A.2d at 717 (holding that Vermont and federal constitutional rights to counsel attach simultaneously).

## II.

¶ 10. Defendant next contends the court erred in permitting the State's medical expert to testify concerning matters outside the scope of his expert report. The medical examiner, Dr. Paul Morrow, performed autopsies on each of the victims and submitted reports detailing his findings, including the extent and location of each victim's injuries. At trial, he testified as to the path of the bullet that hit Jessica Bishop. Over defendant's objection, Dr. Morrow then estimated that Jessica Bishop would have died within a matter of minutes, during which time "she would have been unable to walk; . . . she would have been at least temporarily paralyzed just by the shock of the bullet passing through the spinal canal and involving the nerves to the lower legs." He also testified that she would have "dropped right where she was" when she was shot. Dr. Morrow's testimony indicated that the placement of Jessica Bishop's body was inconsistent with defendant's claim that he was still inside and attempting to run out the door when he shot her and George Weatherwax. Defendant argues that because Dr. Morrow's autopsy report on Jessica Bishop described her injuries without drawing conclusions about the likely effects of those injuries, the court should not have overruled defendant's objections to Dr. Morrow's testimony regarding Jessica Bishop's probable paralysis.

¶ 11. Vermont Rule of Criminal Procedure 16(a)(2)(C) requires the State to disclose the reports of experts, "including results of physical or mental examinations and of scientific tests, experiments, or comparisons:" This duty continues through the trial. V.R.Cr.P. 16.2(b). The discovery rules are intended "to prevent the State from assuming an unfair advantage over the defense." *State v. Streich*, 163 Vt. 331, 349, 658 A.2d 38, 51 (1995). In addition to showing a rule violation, "the defendant still must demonstrate that the violation prejudiced his defense in some meaningful manner to justify relief." *State v. Wade*, 2003 VT 99, ¶ 10, 176 Vt. 550, 839 A.2d 559 (mem.). Defendant has shown neither a violation of the State's discovery obligations nor prejudice resulting from the violation he alleges, so we affirm the trial court's ruling admitting the expert testimony at issue.

¶ 12. While there is no question that defendant was entitled to pretrial notice of the substance of Dr. Morrow's testimony, such notice was not lacking here. In the trial court's order denying defendant's motion for a new trial, the court noted that Dr. Morrow's testimony as to Jessica Bishop's paralysis was an "obvious inference"

from the autopsy report's description of the path of the bullet, which included a lengthy description of the damage to Jessica Bishop's spinal cord. Moreover, defense counsel could have received more detailed notice of this testimony had he not chosen to waive deposition of Dr. Morrow during discovery. At a pretrial status conference, the State informed defense counsel that Dr. Morrow would testify not only as to the cause of each victim's death, but also as to the range at which the shots were fired, the path of the bullets, and the "physical manifestations." Defense counsel commented that this testimony "might go beyond the scope of what's in the autopsy report" and expressed interest in discussing that possibility with Dr. Morrow, but evidently chose not to pursue the matter further. If defendant wanted more explicit information in advance of Dr. Morrow's testimony, he had ample opportunity to gather it.

¶ 13. Even if we were to hold that defendant received insufficient notice of Dr. Morrow's testimony, defendant would still not be entitled to relief without showing that the lack of notice resulted in prejudice. *Wade*, 2003 VT 99, ¶ 10. While defendant may have been prejudiced by Dr. Morrow's *testimony*, which was at least somewhat inconsistent with defendant's version of events, he was not prejudiced by the lack of *notice* of this testimony. The State's opening argument revealed that Dr. Morrow would testify as to Jessica Bishop's paralysis, yet defendant failed to object or ask for additional time to respond. Had he received additional time, defendant has presented neither a basis for casting doubt on Dr. Morrow's conclusions, nor a strategy for resolving or limiting the effect of the inconsistencies they raised. Thus, the trial court did not err in allowing Dr. Morrow's testimony, and we affirm defendant's convictions.

### III.

¶ 14. Defendant finally contends that the trial court erred in sentencing him to four consecutive terms of life without parole based on facts not found by the jury. The statute under which defendant was convicted and sentenced, 13 V.S.A. § 2303, states in relevant part:

> (a) The punishment for murder in the first degree shall be imprisonment for life and for a minimum term of 35 years unless the court finds that there are aggravating or mitigating factors which justify a different minimum term. If the

court finds that the aggravating factors outweigh any mitigating factors, the minimum term may be longer than 35 years, up to and including life without parole. If the court finds that the mitigating factors outweigh any aggravating factors the minimum term may be set at less than 35 years but not less than 15 years.

The statute lists eight aggravating factors and seven mitigating factors for use in increasing or decreasing the minimum term of a life sentence. 13 V.S.A. § 2303(d)-(e). In its sentencing memorandum, the trial court considered each of the statutory aggravating and mitigating factors and found that five of the aggravating factors and none of the mitigating factors applied to defendant's convictions. The five aggravating factors were defendant's prior conviction of lewd and lascivious conduct, the helplessness of the victims, the particular severity, brutality, and cruelty of the murders, the fact that there were multiple victims, and the random, predatory, and arbitrary nature of the murders. Defendant claims that the trial court's use of these factors violated his Sixth and Fourteenth Amendment rights to a jury trial under the federal Constitution.[4]

¶ 15. We agree that the sentencing process the trial court used was unconstitutional. In *Apprendi v. New Jersey*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). *Apprendi* held that it was unconstitutional for a judge to sentence the defendant, who was convicted of firearms possession, which carried a ten-year maximum sentence, to twelve years in prison upon finding that the crime was motivated by bias pursuant to a "hate crime" law. *Id.* at 474-76. The *Apprendi* majority emphasized that nothing in its review of the history of the jury trial right "suggests that it is impermissible for judges to exercise discretion — taking into consideration various factors relating both to offense and offender — in imposing a judgment *within the range* prescribed by statute." *Id.* at 481. In *Blakely v. Washington*, however, the Court clarified that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in*

---

[4] The Sixth Amendment is made applicable to the states through the Fourteenth Amendment. *State v. Jenne*, 156 Vt. 283, 289, 591 A.2d 85, 88 (1991).

*the jury verdict or admitted by the defendant."* 542 U.S. 296, 303 (2004). "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 303-04. According to this reasoning, Vermont's homicide sentencing scheme is unconstitutional. The maximum sentence the court may impose under § 2303(a) without finding any facts in addition to the jury's verdict is life imprisonment with a minimum term of thirty-five years. Increasing that sentence to life without parole on the basis of any facts, other than a prior conviction, that the jury has not found beyond a reasonable doubt, violates the Sixth Amendment.

¶ 16. The State argues that it was permissible to sentence defendant to life without parole under *Apprendi* and *Blakely* because the "statutory maximum" for first-degree murder is life imprisonment, regardless of the minimum term. This argument is inconsistent with the Supreme Court's interpretation of the Sixth Amendment. The *Blakely* majority explained that the requirement that the jury find any fact that "increases the penalty for a crime beyond the prescribed statutory maximum" arises from

> two longstanding tenets of common-law criminal jurisprudence: that the "truth of every accusation" against a defendant "should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours," 4 W. Blackstone, Commentaries on the Laws of England 343 (1769), and that "an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason," 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872).

542 U.S. at 301-02. To escape the conclusion that Vermont's murder statute conflicts with these principles, the State argues that the aggravating factors listed in § 2303(d) are not "essential to the punishment" a convicted defendant receives. In other words, the State argues that defendant's sentence of life without parole was not actually a different punishment from the presumptive sentence of thirty-five years to life.

¶ 17. We find this argument unpersuasive. The structure of Vermont's homicide statute demonstrates the Legislature's intent to attach significance to the difference between minimum terms

accompanying sentences of life imprisonment. Under the State's reasoning, there would be no significant difference between a sentence for first-degree murder, which carries a sentence of life imprisonment with a presumptive minimum term of thirty-five years, and a sentence for second-degree murder, which carries a sentence of life imprisonment with a presumptive minimum term of twenty years. 13 V.S.A. § 2303(a)-(b). We refuse to accept this conclusion. We are persuaded instead by the reasoning of courts in other jurisdictions, interpreting similar statutes, that life without parole and life with a minimum term of imprisonment are different sentences for *Apprendi* purposes. See *State v. Surin*, 2004 WL 2729598, at *3 & n.4 (Fla. Dist. Ct. App.) (stating that "*Apprendi* unquestionably is implicated" when the jury fails to find a fact elevating the defendant's maximum sentence from life with parole to life without parole); *State v. Thomas*, 83 P.3d 970, 984 (Wash. 2004) ("[I]t is clear that the legislature intended a life sentence with the possibility of parole and a sentence of life without parole to be wholly different."); cf. *State v. Fell*, 115 P.3d 594, 599-600 (Ariz. 2005) (holding that trial judge can permissibly choose between life with parole and life without parole under *Apprendi*, but only because legislature did not require courts to find specific additional facts before imposing life without parole). We hold that 13 V.S.A. § 2303(a) violates the rule in *Apprendi* and *Blakely* because it requires the sentencing court to weigh specific aggravating and mitigating factors not found by a jury beyond a reasonable doubt before imposing a sentence of life without parole.

¶ 18. The State next argues that we should uphold defendant's sentence despite the court's reliance on impermissible sentencing factors because the error was harmless. We may find a constitutional or nonconstitutional error harmless only if we can state a belief that the error was harmless beyond a reasonable doubt. *State v. Carter*, 164 Vt. 545, 553-55, 674 A.2d 1258, 1264-65 (1996). The State argues that even if some of the factors relied on by the trial court were impermissible under *Apprendi* and *Blakely*, the trial court's sentencing determination relied on at least two permissible factors: the fact of defendant's prior conviction and the fact of multiple victims. *Apprendi* required only facts "[o]ther than the fact of a prior conviction" to be submitted to a jury, 530 U.S. at 490, and the fact that there were multiple victims follows from the jury's conviction of defendant on all four counts of first-degree murder here.

¶ 19. We agree that the federal Constitution permitted the trial court's use of these facts without additional jury findings, but that does not render the court's error harmless. In fact, the sentencing scheme in § 2303(a) prevents a trial court's consideration of facts not found by the jury from ever being harmless. The statute permits the court to increase the defendant's minimum term above the presumptive thirty-five years only "[i]f the court finds that the aggravating factors *outweigh* any mitigating factors." 13 V.S.A. § 2303(a) (emphasis added). While the trial court might have enhanced defendant's sentence based only on defendant's prior convictions and the presence of multiple victims, without finding additional aggravating factors, it could not have done so without finding the absence of the statutory mitigating factors, such as "duress, coercion, threat or compulsion insufficient to constitute a defense but which significantly affected his or her conduct." *Id.* § 2303(e)(5). The absence of these factors was as "essential to the punishment" defendant received as the presence of the aggravating factors. Thus, we cannot say that the trial court's use of impermissible sentencing factors had no effect on defendant's sentence. Nor can we speculate as to how a jury might have found regarding the presence and weight of the aggravating and mitigating factors in § 2303, as § 2303 does not permit juries to make such determinations. There was no balancing of aggravating and mitigating factors that could have satisfied the demands of both the statute and the Sixth Amendment. We thus have no choice but to vacate defendant's sentence on each count.

¶ 20. The question remains whether to remand the case to the trial court for resentencing. Under these circumstances, remand would serve no purpose. As demonstrated by the harmless error analysis above, *Apprendi* and *Blakely* do not permit the trial court to engage in the weighing process contemplated in the statute. Any sentence the trial court might impose above the presumptive term of thirty-five years to life would necessarily rely on impermissible findings regarding the presence of aggravating factors and the absence of mitigating factors. Ignoring the factors that *Apprendi* and *Blakely* require to be found by a jury, and considering only the factors that can be inferred from defendant's admissions or the jury's verdict, might solve the constitutional problem, but it would fundamentally alter the balance of factors prescribed by the Legislature. It appears that the only sentence consistent with both the federal Constitution and the statute is the presumptive term of life imprisonment with a

minimum term of thirty-five years. In defendant's case, because of the four consecutive sentences imposed by the trial court, this will result in a term of life with a minimum term of imprisonment of one hundred forty years.

¶ 21. Defendant's consecutive minimum terms obviously render the alteration of his sentence practically insignificant, but we anticipate that the Legislature may wish to amend the statute in question, as well as any other statutes prescribing similarly unconstitutional sentencing schemes. We decline to follow the example of those courts that have created their own sentencing procedures to replace legislative schemes held unconstitutional in the wake of *Apprendi* and *Blakely*. See, e.g., *Edwards v. State*, 822 N.E.2d 1106, 1110 (Ind. Ct. App. 2005) (remanding attempted-murder defendant's unconstitutional sentence to trial court "with instructions to either convene a jury for sentencing purposes or impose the presumptive sentence"); *State v. Natale*, 878 A.2d 724, 740-41 (N.J. 2005) (eliminating presumptive terms and allowing trial courts to use discretion in imposing sentences within range previously permitted only after finding aggravating factors). It is not at all clear whether the Legislature would prefer an indeterminate sentencing scheme placing greater discretion in trial judges, or a scheme requiring juries to conduct whatever additional fact-finding is needed. The only intent expressed by the Legislature in § 2303(a) is that trial courts sentence defendants convicted of first-degree murder to life in prison with a presumptive minimum term of thirty-five years unless the aggravating factors listed outweigh the mitigating factors. The system the Legislature has established for weighing the listed factors violates the Sixth and Fourteenth Amendments. Until the Legislature designs a constitutionally permissible means by which the factors can be weighed, there can be no basis for adjusting defendant's sentence above the presumptive term.

*Defendant's convictions are affirmed. Defendant's sentences are vacated; he is sentenced to four terms of imprisonment for life with minimum terms of thirty-five years, to be served consecutively.*