2006 VT 86

## State of Vermont v. Cynthia Baird

[908 A.2d 475]

No. 04-509

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed August 25, 2006

---

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Peter F. Langrock* and *Devin McLaughlin* of *Langrock Sperry & Wool, LLP*, Middlebury, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant was convicted of second-degree murder after a jury trial in Rutland District Court. The district court denied her motions for judgment of acquittal and a new trial and sentenced her to a term of imprisonment of twenty years to life. She now appeals, arguing that the court erred in denying her post-trial motions because: (1) the State presented inconsistent theories of guilt and thus failed to prove its case beyond a reasonable doubt; (2) the court erroneously admitted testimony that defendant told a witness that she would like to shoot her husband; and (3) the jury instructions regarding circumstantial evidence were improper. Defendant also argues that her sentence must be vacated because: (1) the court erred in its assessment of the aggravating and mitigating factors set forth in 13 V.S.A. § 2303(d)-(e); and (2) the court penalized her for exercising her right to a jury trial by considering her lack of acceptance of responsibility during sentencing. Finally, defendant argues that the court incorrectly rejected her application to require the court or the State to pay for the trial transcript. We affirm in all respects.

¶ 2. The evidence at trial revealed the following. On December 2, 2000, defendant and her husband, Douglas Baird, had dinner together in Rutland. After dinner, they walked to another nearby eatery, where, after several drinks each, they had a disagreement loud enough to catch the staff's attention. Eventually, Mr. Baird, who appeared aggravated, walked out and left defendant behind to pay the tab. Defendant drove the two of them back to their home in Poultney because Mr. Baird was too intoxicated to drive.

¶ 3. At 12:21 a.m. on December 3, 2000, the Vermont State Police dispatcher in Rutland received a 911 call from defendant, who was screaming hysterically that her husband had shot himself. Officer Dale Kerber, a special officer for the Town of Castleton, was the first to arrive on the scene. He testified that he found defendant in a "hysterical" state, standing in the doorway holding a telephone, pointing into the house, and shouting that her husband had just shot himself. Officer Kerber entered the house and turned in the direction defendant was pointing, where he found a door cracked open directly in front of him. Drawing his service weapon, he approached the door. In order to open it, he had to push away some pillows or bedding that had been placed against the other side of the door. Upon entering the room, he saw a man lying on the bed with his eyes shut and blood around his head. Officer Kerber observed no breathing movement or other signs

of life. Defendant remained directly behind Officer Kerber as he scanned the room. He testified that defendant went silent when he drew his gun and resumed her "crying" and "hysteria" once he reholstered it.

¶ 4. Officer Kerber then went into the living room with defendant, who appeared "very hysterical." Defendant sat on a couch and, as Officer Kerber went to sit on an adjacent coffee table, he nearly sat on a sharp wool-carding tool. He testified that defendant, who had been extremely agitated, "very calmly and very politely apologized" for leaving the tool out and then resumed her hysterics. Several rescue workers on the scene that night also testified that they looked at defendant's face and did not observe tears during the time that she was hysterical. After Officer Kerber spent some time with defendant and was unable to calm her down, she agreed to go to the hospital to see a crisis counselor.

¶ 5. Meanwhile, the police processed the scene of the shooting. They found Mr. Baird's body lying supine on the bed, his head on the pillow and arms at his sides. Blood had pooled on the pillow and sheet below the gunshot entry wound on the right side of his head but nowhere else. There were two guns found in the room: an unloaded Taurus .357 revolver with a six-inch barrel on a night stand on the side of the bed farthest from the deceased, and a small .22 automatic on the floor. In searching the house, the police found another Taurus .357, this one with a four-inch barrel, in a case in the closed bottom drawer of a bureau in an upstairs room. This gun had a full cylinder containing five live .38 caliber cartridges and one empty cartridge case.

¶ 6. The medical examiner testified that Mr. Baird had died in the position in which he was found from a single gunshot wound to the right side of his head. The bullet passed through the cerebral cortex, resulting in instant unconsciousness, and lodged in the left side of the skull. The metallic composition of the bullet matched that of the unfired cartridges in the cylinder of the four-inch Taurus found in the upstairs bureau drawer. In addition, a small stain on the inside of the four-inch Taurus's barrel was tested for DNA, yielding a pattern that matched Mr. Baird's DNA.

¶ 7. Both defendant and Mr. Baird were tested for gunshot residue (GSR). The State's GSR expert testified that, although he could not conclude based on the GSR who shot Mr. Baird, the amount of GSR found on Mr. Baird was not consistent with a self-inflicted wound. The expert observed a video of the processing of the crime scene and

testified that the movements of Mr. Baird's body by personnel at the scene would not have caused significant shedding of GSR particles. No GSR was found on defendant's hands. The expert testified that two to five hours of normal activity would shed all detectable GSR particles from a person's hands; defendant's hands were tested more than seven hours after she called 911.

¶ 8. Defendant did not testify at trial. Thus, the only testimony concerning the events that transpired between the time the couple left the restaurant and defendant's 911 call came from the statements defendant made to the police after they arrived on the scene, later at the hospital, and the following day. The State elicited testimony regarding defendant's version of what happened from law enforcement personnel who interacted with defendant and offered into evidence audiotapes of two police interviews of defendant, one conducted at the hospital after defendant was taken there from the scene of the shooting and the other conducted at her home two days later. Both tapes were admitted and played for the jury, and a transcript of the hospital interview was admitted as well.

¶ 9. In sum, defendant told the police that Mr. Baird shot himself after she walked into the bedroom with an unloaded gun and tried to get his attention by threatening to kill herself. She explained that they had continued discussing things that were bothering each of them after returning home from having dinner and drinks. Mr. Baird eventually ended the conversation by getting up and saying he was going to bed because he was going hunting in the morning. Defendant said she "felt like he was cutting me off," so she went upstairs and got the four-inch Taurus revolver. As she walked into the bedroom, she said: "I should take this frigging thing I should blow my brains out." She claimed that her husband then reached into a drawer in the bedside table, pulled out a gun, and, without a word, shot himself in the head. At that point, she told the police, she "saw the blood, freaked, ran to my desk and called 911."

¶ 10. Later, when interviewed at the hospital, she told the detective that she was not sure she was in the room when her husband shot himself but that she "never saw him shoot the gun." She gave several more inconsistent accounts of whether she observed him shoot himself or not.

¶ 11. On February 13, 2004, the jury returned a verdict of guilty on the single charge of second-degree murder. Defendant filed motions for acquittal and a new trial under Vermont Rules of Criminal Procedure 29 and 33, respectively, and the court denied both. The court sentenced

defendant on November 3, 2004, imposing a term of imprisonment of twenty years to life. Defendant then filed the instant appeal.

## I.

## A.

¶ 12. Defendant claims that her conviction must be reversed because the State failed to prove its case beyond a reasonable doubt. More specifically, she argues that the State's case is internally inconsistent because if she "had murdered her husband and wanted it to look like a suicide, she would have put the weapon in his hand, not upstairs." Therefore, she argues, the only way the jury could have reached a guilty verdict was through speculation and unsupportable inferences from the evidence. It does not matter, however, if some of the evidence appeared inconsistent to the State's theory. What matters is whether the State presented sufficient evidence to support the jury's finding of guilt beyond a reasonable doubt. The State is not required to explain a defendant's illogical behaviors. Because the facts of the case support the verdict, we reject defendant's argument and affirm her conviction.

¶ 13. With respect to defendant's claim that the evidence was insufficient to support the verdict, this Court will review the evidence presented by the State "viewing it in the light most favorable to the prosecution and excluding any modifying evidence, and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." *State v. Grega*, 168 Vt. 363, 380, 721 A.2d 445, 457 (1998). When reviewing a case based largely on circumstantial evidence, the evidence "must be considered together, not separately," even if defendant can explain each individual piece of evidence in a way that is inconsistent with guilt. *Id.* "In assessing circumstantial evidence, the fact-finder may draw rational inferences to determine whether the disputed ultimate facts occurred." *State v. Durenleau*, 163 Vt. 8, 12, 652 A.2d 981, 983 (1994). To survive a motion for acquittal, "[t]he evidence and inferences, however, must add up to more than mere suspicion; the jury cannot bridge evidentiary gaps with speculation." *Id.* at 12-13, 652 A.2d at 983. Finally, we have expressly declined to "fashion a hard and fast rule regarding the sufficiency of evidence in a circumstantial case. Rather, each case must be based on its own facts and circumstances, and a judgment of acquittal is proper only if the prosecution has failed to put forth any evidence to substantiate a jury verdict." *State v. Couture*, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999).

¶ 14. A careful review of the evidence reveals that the State met its burden in this case. First, the evidence adduced at trial allowed the jury to properly conclude Mr. Baird was lying in the bed on his back when he was shot. For example, there was evidence that blood had pooled on the pillow and sheet under the gunshot entry wound, suggesting that the position of Mr. Baird's body did not change appreciably after the shooting, and the medical examiner concluded that Mr. Baird died in the supine position in which he was found. On the other hand, there was no evidence that blood was found in any location consistent with Mr. Baird being shot while sitting up, as defendant described in at least one statement, or while grabbing a gun from the bedside table and moving back towards the bed.

¶ 15. Additionally, the jury heard that there was some blood spatter on the right top of Mr. Baird's shoulder area and that the detective who inspected Mr. Baird's body found no blood spatter on Mr. Baird's hands. Further, the GSR expert testified that the amount of residue found on Mr. Baird's hands was inconsistent with him having shot himself. These facts, combined with the evidence concerning the position of the victim's body at the time of the shooting, supported the conclusion that Mr. Baird did not shoot himself.

¶ 16. The State also presented testimony from friends and family of Mr. Baird who indicated that, in the days and weeks prior to his death, he was upbeat, in good spirits, and excited about the new job he had recently secured. Although there was testimony concerning defendant's dissatisfaction with her relationship with Mr. Baird as well as evidence that the couple had a heated exchange on the night of the shooting, the jury could have reasonably concluded that Mr. Baird did not want or attempt to take his own life.

¶ 17. Taken together, the evidence summarized above fairly and sufficiently allowed the jury to conclude that Mr. Baird did not shoot himself. At that point, the jury could have permissibly inferred that defendant shot Mr. Baird, because there was no evidence that anyone other than Mr. Baird or defendant was in their home that night. Moreover, the State adduced additional evidence directly supporting this conclusion. For example, the State demonstrated that Officer Kerber, the first responder to arrive at the Bairds' home, had to push several pillows out of the way as he opened the door of the bedroom in which he found Mr. Baird, and the television in the living room had been turned up to a high volume. From those facts, the jury could reasonably conclude that defendant had attempted to muffle and mask the sound of the gunshot.

¶ 18. The State also offered evidence that police found the gun that fired the bullet recovered from Mr. Baird's head in the closed bottom drawer of a bureau in an upstairs room of the Bairds' home. In addition to the ballistics evidence that that gun had fired the bullet removed from Mr. Baird, testing of a small stain found on the inside of the gun's barrel yielded a pattern matching Mr. Baird's DNA. Thus, there was strong support to conclude that the upstairs gun was the weapon used to kill Mr. Baird. As there was no other explanation, the jury could reasonably conclude that defendant took the gun from the scene of the shooting and placed it upstairs. And, as defendant was still on the phone with 911 when the police arrived, it was reasonable to conclude that the gun had been placed upstairs in the case before defendant made the call. Although, as defendant argues, that fact alone is not inconsistent with Mr. Baird having shot himself, when viewed, as it must be on appeal, along with the other evidence, it supports the conclusion that defendant shot Mr. Baird.

¶ 19. Significantly, we note that the evidence discussed above does not include most of the evidence defendant attempts to discount in her argument on appeal. For example, the above analysis does not depend on the GSR expert's inability to conclude who fired the shot, the inconsistent statements defendant made about the night of the shooting, the small amounts of blood found on a towel and a t-shirt, or the evidence concerning defendant's motive.* We therefore disagree with defendant that the evidence here, considered as a whole, equally supports guilt or innocence.

¶ 20. Finally, defendant argues that the State did not meet its burden to disprove her claim that her husband committed suicide. As the trial court instructed the jury, the State had to prove "that Douglas Baird's life ended by means other than natural causes, accident or suicide." Seizing on this instruction, defendant asserts that if she had fabricated her claim that Mr. Baird shot himself, she never would have removed the gun that fired the shot from the scene of the shooting. Thus, she reasons, the only logical conclusion the jury could have drawn from the fact that she moved the gun is that Mr. Baird shot himself.

---

* The State introduced testimony concerning an extramarital affair defendant had with a co-worker. The co-worker broke the affair off and returned to his wife shortly before Thanksgiving, a decision that apparently angered defendant.

■ ¶ 21. The argument fails for two reasons. First, in light of the evidence summarized above, the notion that Mr. Baird shot himself is incredible on its face. The defense claim was that he suddenly committed suicide, without saying a word, without any provocation, with no prior indication of suicidal thinking or unhappiness with life, and very shortly after going to bed with plans to go hunting in the morning. That scenario, when considered along with the evidence at trial, is so improbable that the jury could have properly rejected it and concluded that defendant, the only other person in the house, murdered her husband, moved the gun, and came up with the suicide explanation to deflect suspicion. Second, the jury was justified in concluding that Mr. Baird was asleep when he was shot, given that he was found in bed, lying on his back, unclothed, with his arms at his sides, and partially covered with bed linens. Additionally, defendant told the police that, after continuing their argument upon arriving at their home, Mr. Baird announced he was going to bed and left the room to do so. Finally, in light of the evidence that Mr. Baird had imbibed a number of alcoholic beverages that evening and that the medical examiner confirmed his blood alcohol content at the time of death was .187%, the jury could have reasonably concluded that Mr. Baird was asleep, and thus unable to shoot himself, at the time of the shooting.

■ ¶ 22. In sum, the evidence discussed above sufficiently and fairly supports the jury's determination of guilt beyond a reasonable doubt. Therefore, the court correctly denied defendant's motion for judgment of acquittal. It also follows that defendant was not entitled to a new trial under Rule 33 because the evidence here does not preponderate heavily against the verdict, and no miscarriage of justice flows from the verdict. *State v. Ladabouche*, 146 Vt. 279, 285, 502 A.2d 852, 856 (1985) (stating that a new trial "should be granted only where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result," and recognizing that a Rule 33 motion does not allow the trial court to act as a "thirteenth juror" by granting a new trial simply because it disagrees with the jury's verdict (quotations omitted)). Accordingly, the court did not abuse its discretion by denying defendant's motion for a new trial. See *State v. Elkins*, 155 Vt. 9, 18, 580 A.2d 1200, 1205 (1990) ("The court's decision on a new trial motion is a matter committed to the sole discretion of the court and will stand on appeal unless defendant can show that the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." (quotations omitted)).

## B.

¶ 23. Defendant next argues that her conviction must be reversed because the court erroneously admitted testimony of defendant's accountant, Phyllis Leavy, that defendant occasionally said to Ms. Leavy that she would like to shoot her husband. Determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value are matters within the sound discretion of the district court, and we will not overturn such decisions absent an abuse of discretion. *State v. White*, 172 Vt. 493, 500, 782 A.2d 1187, 1192 (2001). No abuse occurred here.

¶ 24. The challenged testimony consisted of Ms. Leavy's statement that defendant, on multiple occasions, "said that she was very annoyed with him and she was going to take a gun and kill him. She'd like to shoot him . . . ." Ms. Leavy went on to explain that she did not alert anyone to defendant's statements because defendant "was always annoyed about something" and because Ms. Leavy "just thought of it as a figure of speech and not something that I considered seriously at that time."

¶ 25. Defendant argues that Ms. Leavy's testimony was irrelevant under Vermont Rule of Evidence 401 because occasional expressions of anger about one's spouse are a natural part of any marriage and Ms. Leavy herself disclaimed the statements as mere "figure[s] of speech." We disagree. Ms. Leavy's testimony was relevant to defendant's frame of mind concerning her husband and her marriage, which in turn provided context for the events on the night of the shooting.

¶ 26. This conclusion finds support in our caselaw. For example, in *White*, we upheld the admission of testimony concerning the defendant's marital difficulties that was more attenuated than Ms. Leavy's testimony. The defendant in *White* was charged with killing a night clerk at a motel where he had once worked. The murder took place at the motel sometime after 1:00 a.m., when the clerk was seen working at the desk by some motel guests. The testimony at issue was delivered by the defendant's co-worker at another workplace and consisted of statements the defendant made eight days after the murder about getting a divorce. The trial court admitted the testimony as relevant to the defendant's state of mind, accepting the State's theory that the testimony showed that the defendant's marital situation was "such that he may want to stop off someplace overnight rather than go[] home." 172 Vt. at 500, 782 A.2d at 1192 (quotations omitted). We affirmed,

stating that "[s]ince the jury knew that defendant was married, it was appropriate to provide [the jury] with additional information concerning the state of the marriage, so that defendant's activities that night would make more sense, and thus be 'more probable ... than it would be without the evidence.'" *Id.* at 500, 782 A.2d at 1193 (omission in original) (quoting V.R.E. 401). Here, because defendant was charged with the murder of her husband, evidence concerning her attitude about her marriage and her husband was relevant to provide context concerning her state of mind.

¶ 27. The fact that Ms. Leavy disclaimed the statements as "figures of speech" does not render them irrelevant. Because the jury was the arbiter of witness credibility, it could decide to accept or reject a witness's opinion concerning the mental state of another person about whom that witness testifies. Thus, it was free to interpret the statements and reject Ms. Leavy's interpretation. Therefore, her characterization of the statements as "figure[s] of speech" does not rob them of their relevance.

■ ¶ 28. Finally, the admission of Ms. Leavy's testimony did not violate Vermont Rule of Evidence 403, which calls for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." V.R.E. 403. The statements did carry probative value because, as explained above, they provided context for defendant's alleged activities on the night of the shooting. Defendant asserts that the testimony is unduly prejudicial because it invites the jury to take a "speculative leap." Evidence is unduly prejudicial when "its primary purpose is to appeal to the jury's sympathies, arouse a sense of horror, provoke its instinct to punish, or cause the jury to base its decision on something other than the established propositions of the case." *State v. Crannell*, 170 Vt. 387, 402, 750 A.2d 1002, 1015 (2000). Ms. Leavy's testimony was not unfairly prejudicial. Indeed, on the whole it was relatively balanced, in that it allowed defendant to argue that defendant's statements about wanting to shoot her husband were not perceived by the listener as actual threats of violence. Accordingly, the district court did not abuse its discretion in admitting Ms. Leavy's testimony.

## C.

¶ 29. Finally, we reject defendant's argument that her conviction must be reversed because the district court declined to include specific language in its jury charge on circumstantial evidence. During the charge conference, defendant requested that the court include the

following language from *Durenleau* in its instructions on circumstantial evidence: "The evidence and inferences, however, must add up to more than mere suspicion; the jury cannot bridge evidentiary gaps with speculation." 163 Vt. at 12-13, 652 A.2d at 983. The court declined to insert the quotation but decided to add the emphasized language at the end of its circumstantial evidence charge:

There are two types of evidence from which you may find the truth as to the facts in this case; direct evidence and circumstantial evidence. Direct evidence is that testimony of a person who asserts actual and personal knowledge of the particular fact, such as an eyewitness. Circumstantial evidence is evidence that does not directly prove a fact, but that points to the existence of the fact. Circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant.

The law does not require that the defendant's guilt be established by direct evidence alone.... One or more of the essential elements or all of the essential elements may be established by probable and reasonable deduction or inference from other facts which are established by direct testimony. Circumstantial evidence may, by itself, be sufficient proof of the commission of a crime upon which to find a defendant guilty. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should accept all of the evidence you find to be credible and discard any evidence you do not consider to be credible.

*You are reminded that the defendant is not to be convicted on mere suspicion or conjecture or a mere probability of guilt.*

(Emphasis added.) The emphasized language thus incorporated explicitly the first clause of the *Durenleau* quotation by advising the jury that it could not convict based on "mere suspicion or conjecture or a mere probability of guilt." Therefore, defendant's argument turns on whether the court erred by refusing to include the exact phrase "the jury cannot bridge evidentiary gaps with speculation." We hold that it did not.

¶ 30. We review jury instructions "as a whole and not piecemeal," in order to ensure that they "accurately state the law on every theory fairly put forward by the evidence." *State v. Verrinder*, 161 Vt. 250, 266, 637 A.2d 1382, 1392 (1993). "Within those parameters, the trial court may exercise its discretion in the wording of the jury charge; a defendant is not entitled to have specific language included." *Id.*

¶ 31. Here, the instructions on circumstantial evidence accurately and fairly reflect the law. First, the court correctly defined circumstantial evidence as "evidence that does not directly prove a fact, but that points to the existence of the fact." See, e.g., *State v. Warner*, 151 Vt. 469, 472-73, 560 A.2d 385, 387-88 (1989) ("Circumstantial evidence has been defined as that proof offered of certain facts and circumstances from which the trier of fact may, by way of a process of rational inference, conclude that the ultimate facts in dispute did or did not occur."). The court then advised the jury that circumstantial evidence alone could support a conviction, *id.* at 472, 560 A.2d at 387, explaining that some or all of the elements of an offense "may be established by probable and reasonable deduction or inference from other facts which are established by direct testimony." The court also reminded the jury that it should accept the evidence it found to be credible and ignore the evidence it did not find credible. Following on the heels of these instructions, the court's warning against finding guilt based on "mere suspicion or conjecture or a mere probability of guilt" protected defendant from the possibility of the jury reaching a guilty verdict by using speculation to bridge gaps in the evidence. Accordingly, we reject defendant's argument that the court's refusal to insert the quoted language from *Durenleau* was reversible error, see *State v. Percy*, 158 Vt. 410, 419, 612 A.2d 1119, 1125 (1992) (recognizing that, in challenging jury instructions, a "defendant may not complain because the court has refused to employ the exact terms he has requested"), and affirm the conviction.

## II.

¶ 32. Defendant raises two arguments in support of her claim that her sentence ought to be vacated. First, she asserts that the trial court erred in balancing the aggravating and mitigating factors of 13 V.S.A. § 2303(d)-(e). Second, she contends that the court penalized her for asserting her innocence and exercising her right to a jury trial when it considered her denial of responsibility during sentencing. We reject both.

¶ 33. The trial court considered the statutory aggravating and mitigating factors and set out its findings and conclusions in a sentencing memorandum as required by § 2303(c). It concluded that Mr. Baird was particularly vulnerable because he was asleep or resting when shot, *id.* § 2303(d)(4), and that § 2303(d)(7), the aggravating factor for a homicide that "was random, predatory or arbitrary in nature," had "some limited utility" because defendant's conduct "appears to be arbitrary in the sense that it can be characterized as being done impulsively."

¶ 34. In assessing possible mitigators, the court found that defendant's lack of a criminal record was a mitigating factor under § 2303(e)(1). Under § 2303(e)(2), the court considered that defendant had told the police she was depressed and that she suffered a grief reaction and concluded that "this factor has some applicability, [and] it is a limited mitigating factor." The court heavily qualified this factor, however, noting that defendant failed to adequately present the extent of her claimed depression, that her grief reaction was equally consistent with having witnessed her husband shoot himself as with having shot him, and that her voluntary consumption of alcohol and discontinuation of medication did not significantly reduce her culpability. Finally, the court stated that it would consider her "pro-social lifestyle" and absence of a history of violence, although not as a separate mitigating factor under § 2303(e)(7).

¶ 35. The court concluded that the aggravating and mitigating factors were "essentially balanced, with neither outweighing the other to the extent that the minimum sentence of 20 years should be increased or decreased." The court also considered the traditional goals of sentencing: punishment, rehabilitation, deterrence, and public protection. In particular, it found that defendant's denial of responsibility minimized the likelihood of rehabilitation, which in turn posed a danger to the public. It also noted the importance of deterring defendant and others from similar conduct. In light of its assessment of the statutory factors and the traditional sentencing goals, the court imposed the presumptive sentence under § 2303(b).

■ ¶ 36. Preliminarily, we note that our decision in *State v. Provost*, 2005 VT 134, 179 Vt. 337, 896 A.2d 55, does not mandate reversal of defendant's sentence. There, we held 13 V.S.A. § 2303 unconstitutional because it required the sentencing court to weigh aggravating and mitigating factors not found by a jury beyond a reasonable doubt in deciding whether to give a sentence greater than the presumptive

sentence set forth in the statute. *Id.* ¶ 17. Defendant has raised neither *Provost*, which issued after her appeal was argued but was still pending, nor *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), or *Blakely v. Washington*, 542 U.S. 296, 303 (2004), upon which *Provost* was based, as grounds for vacating the sentence. Instead, she argues that the district court misbalanced the statutory factors in light of the relevant facts when it decided to give her the presumptive sentence instead of a lesser sentence. In other words, she has chosen to attack the manner in which the court applied the statutory factors, rather than challenge the court's authority to engage in the fact-finding contemplated by the statute. Thus, she has waived any claim of error based on *Provost*. See *State v. King*, 2006 VT 18, ¶ 13, 179 Vt. 400, 897 A.2d 543 (holding that defendant waived ability to challenge sentencing process on appeal by explicitly agreeing to have trial court serve as fact finder to determine appropriate sentence, and sentence did not exceed statutory maximum for crimes to which defendant pled).

¶ 37. In addition, in *Provost*, the court imposed a sentence above the statute's presumptive sentence based on its determination that the aggravators outweighed the mitigators, so that the "absence of these [mitigating] factors was as essential to the punishment defendant received as the presence of the aggravating factors." *Provost*, 2005 VT 134, ¶ 19 (quotations omitted). By contrast, while the presence of a mitigating factor here may have enabled the court to reduce the minimum sentence, it did not require the court to do so. Thus, *Provost* does not require reversal here.

¶ 38. We will uphold a trial court's sentencing decisions absent an abuse of discretion. *King*, 2006 VT 18, ¶ 15. Even where we find such abuse, however, Rule 52(a) of the Vermont Rules of Criminal Procedure instructs us to disregard "[a]ny error ... which does not affect substantial rights." V.R.Cr.P. 52(a); see *State v. Bacon*, 169 Vt. 268, 273, 733 A.2d 50, 54 (1999) ("The harmless error doctrine applies to sentencing proceedings."). Whether an error is constitutional or nonconstitutional, we may find it harmless "only if we can state a belief that the error was harmless beyond a reasonable doubt." *Provost*, 2005 VT 134, ¶ 18. Thus, in order to find a sentencing error harmless, we must conclude beyond a reasonable doubt that, absent the error, the defendant would not have received a lesser sentence. See *State v. Oscarson*, 2004 VT 4, ¶ 30, 176 Vt. 176, 845 A.2d 337 (stating that for erroneous admission of evidence at trial to be harmless, appellate court "must find beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error").

¶ 39. We reject defendant's first argument because, assuming arguendo that the court erred in balancing the aggravating and mitigating factors, any such error would be harmless beyond a reasonable doubt. Defendant claims that, absent the aggravating factors, the presence of one clear mitigating factor, defendant's lack of a criminal history, justified a sentence below the statutory minimum. While the presence of the mitigating factor might have *enabled* the court to depart from the presumptive minimum, it did not *require* such a departure, see 13 V.S.A. § 2303(b) (stating that if mitigators outweigh aggravators, "the minimum term *may* be set at less than 20 years" (emphasis added)), especially in light of the court's valid observations concerning the traditional goals of sentencing as applied to this case, see *State v. Corliss*, 168 Vt. 333, 342, 721 A.2d 438, 445 (1998) (affirming court's "consideration of traditional common law factors such as punishment, deterrence, or rehabilitation"). Thus, even removing the aggravating factors from the equation, the court's decision to impose the statutory minimum did not prejudice defendant's substantial rights, and any error in considering the aggravating factors was harmless beyond a reasonable doubt.

¶ 40. Defendant also argues that the court improperly treated her failure to accept responsibility at sentencing as a "surrogate for maintaining her innocence through trial and sentencing." The court made crystal clear in its sentencing memorandum, however, that it was considering defendant's denial of responsibility "[a]t this juncture," i.e., at sentencing, and not at any prior stage of the proceedings. It went on to explain that her denial was relevant to the extent it related to her prospects for rehabilitation, which in turn related to the danger she posed to the public, and it explicitly declined to view defendant's denial of responsibility and failure to show remorse as an aggravating factor under the catch-all provision of § 2303(d)(8). Thus, the court properly limited its consideration of defendant's failure to accept responsibility to her denial at the time of sentencing and to the impact of her denial on the core sentencing goals of rehabilitation and protection of the public. Accordingly, we affirm defendant's sentence.

III.

¶ 41. Finally, defendant argues that Rule 10(b)(6) of the Vermont Rules of Appellate Procedure requires the court or the State to pay for her trial transcript. The rule provides in relevant part that "[i]n any

criminal case resulting in a sentence of life imprisonment where the defendant has not waived appeal, the clerk of the trial court shall, 10 days after the entry of judgment, order ... a complete transcript of the proceedings." V.R.A.P. 10(b)(6).

¶ 42. Defendant moved to compel the district court or the State to order and pay for a complete transcript. The court denied the motion, reasoning that Rule 10(b)(6) does not suggest that courts must pay for the transcripts that the rule requires them to order. Additionally, the court denied defendant's request to compel the State to pay for the transcripts because defendant had private counsel, made no claim of indigence, and had not applied to proceed in forma pauperis. On appeal, defendant argues that the plain language of Rule 10(b)(6) requires the court to pay for the transcript because the rule directs the court to order the transcript and "[o]rdering requires payment." Defendant reasons that "[w]ithout prepayment, the transcripts have not been ordered."

¶ 43. Under our appellate rules, however, the default position is that the party relying on all or part of a transcript in an appeal must bear the cost, unless that party demonstrates that he is entitled to have the State pay. Specifically, Rule 10(b)(4) provides that "[a]t the time of ordering [of a transcript] ... , a party shall pay ... the correct deposit for such part ordered or shall move for the preparation of the designated parts at the expense of the state on the ground that the party is proceeding on appeal in forma pauperis." V.R.A.P. 10(b)(4). The plain language of Rule 10(b)(4) thus requires "a party," not a court or the State, to pay for the transcript, unless that party is proceeding in forma pauperis. Additionally, the use of the non-party-specific phrase "[a]t the time of ordering" indicates that, regardless of who ordered the transcript, the only way for the party relying on the transcript to avoid paying is by obtaining in forma pauperis status and thereby shifting the cost of the transcript to the State. See State v. Bargo, 147 Vt. 322, 323, 515 A.2d 1071, 1071-72 (1986) (requiring, where only one out of four defendants jointly appealing their convictions obtained in forma pauperis status, the State to pay that defendant's pro rata share of transcript costs and each of the three financially able defendants to pay his pro rata share). Thus, Rule 10(b)(6)'s requirement that the trial court order the transcript simply insures that this function occurs as a matter of course in cases in which appeal is automatic. See V.R.A.P. 3(b)(2) (obviating necessity of filing notice of appeal to commence appeal of criminal case involving sentence of life imprisonment). This requirement does not, however, alter the default allocation of transcript costs

to the party relying on the transcript in its appeal. Because defendant here never applied for, let alone obtained, in forma pauperis status, the district court correctly denied her request to shift her payment obligation to the State or the district court.

*Affirmed.*