NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 15

No. 2019-319

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Steven D. Bourgoin | January Term, 2021 |

Kevin W. Griffin, J.

Sarah F. George, Chittenden County State's Attorney, and Andrew Gilbertson and David Tartter, Deputy State's Attorneys, Burlington, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1.    **EATON, J.**  Defendant appeals jury convictions on five counts of second-degree murder, one count of grossly negligent operation, and one count of operating a vehicle without the owner's consent. The charges stemmed from a tragic incident during which defendant drove the wrong way on the interstate and crashed into a car, killing five teenagers, before fleeing the scene in a police cruiser, returning to the scene shortly thereafter by again driving the wrong way on the interstate, and crashing into the wreckage. Defendant, who asserted insanity and diminished-capacity defenses at trial, argues that he is entitled to reversal of his murder convictions because the State failed to prove the intent element of second-degree murder and the trial court erred in admitting undisclosed testimony and in instructing the jury. We affirm.

¶ 2. At around midnight on October 8, 2016, shortly after merging onto Interstate 89 at Exit 11 heading south, defendant turned his vehicle around and began driving north at high speeds in the southbound lanes. Before crashing into the teenagers' car, defendant drove at high speeds past several other vehicles that honked their horns, flashed their lights, or pulled off the road to get defendant's attention or get out of his way. Shortly after the crash, while the first police officer at the scene attempted to free the teenagers from their burning car, defendant fled the scene in the officer's cruiser and headed south in the southbound lanes back towards Exit 11. But before reaching Exit 11, defendant turned the cruiser around and again headed north in the southbound lanes. He drove into the wreckage from the first collision at over one hundred miles an hour, injuring several people.

¶ 3. The State charged defendant with five counts of second-degree murder, one count of grossly negligent operation, and one count of operating a vehicle without the owner's consent. During the thirteen-day jury trial held in mid-May 2019, defendant presented the testimony of two forensic psychiatrists in support of his insanity defense. The State presented its own expert to counter that defense. At the conclusion of the trial, the jury rejected defendant's insanity defense and found him guilty of all charges. The trial court denied defendant's post-trial motions, including his renewed motion for judgment of acquittal. Following a hearing, the court sentenced defendant to twenty-six-years-to-life on the murder convictions, one-to-two years on the grossly-negligent-operation conviction, and four-to-five years on the conviction for aggravated operation without the owner's consent—all to be served concurrently.

¶ 4. On appeal, defendant argues that: (1) he was entitled to judgment of acquittal on the murder charges because the State failed to prove beyond a reasonable doubt the intent element of second-degree murder; (2) the trial court committed plain error by not instructing the jury that the State expert's opinion on his insanity defense was irrelevant to his diminished-capacity defense; (3) the court violated discovery rules and his constitutional due process rights by allowing

the State's expert to offer a new opinion on a defense expert's diagnosis of defendant on the eve of the State expert's rebuttal testimony, after the defense experts had testified and were no longer available; and (4) the court abused its discretion by not declaring a mistrial after learning that the State had failed to disclose statements made by a defense witness—defendant's former intimate partner—to the prosecution during pretrial conversations.

## I. Motion for Judgment of Acquittal

¶ 5.     In a post-trial motion, defendant renewed his argument that he should be acquitted of the murder charges because the State failed to prove that at the time of the crashes his mental state satisfied the minimal intent element required to convict him of second-degree murder— wanton disregard of the likelihood that death or great bodily harm would result from his actions. See V.R.Cr.P. 29(c) (allowing defendant found guilty by jury verdict to move for judgment of acquittal within fourteen days after jury's discharge). The trial court rejected this argument and denied defendant's motion, ruling that the State produced sufficient circumstantial evidence of defendant's subjective awareness of the deadly risk his actions posed for the jury to conclude beyond a reasonable doubt that the State had met the minimal intent element for second-degree murder.

¶ 6.     In considering defendant's request for judgment of acquittal, we apply the same standard as the trial court, without deferring to the trial court's ruling: we view the evidence presented at trial "in the light most favorable to the State, excluding any modifying evidence, and determine whether it is sufficient to fairly and reasonably convince a trier of fact that the defendant is guilty beyond a reasonable doubt." State v. Davis, 2018 VT 33, ¶ 14, 207 Vt. 346, 186 A.3d 1088 (quotation omitted); see also State v. Berard, 2019 VT 65, ¶ 7, ___ Vt. ___, 220 A.3d 759 ("We review the denial of a judgment of acquittal de novo."). "This standard is deferential to the role of the jury—it recognizes that trial and appellate courts should hesitate to place themselves in the position of jurors." Davis, 2018 VT 33, ¶ 14. Accordingly, "courts should grant a judgment

3

of acquittal only when there is no evidence to support a guilty verdict." State v. Cameron, 2016 VT 134, ¶ 5, 204 Vt. 52, 163 A.3d 545; see also State v. Johnson, 2013 VT 116, ¶ 26, 195 Vt. 498, 90 A.3d 874 ("A judgment of acquittal is proper only if the prosecution has failed to put forth any evidence to substantiate a jury verdict.").

¶ 7.    Second-degree murder is defined in 13 V.S.A. § 2301 as all types of murder other than first-degree murder, which is specifically defined therein. Thus, "the Legislature has left it to this Court to flesh out the elements of second-degree murder," which "we have reiterated . . . requires an intention to kill, an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm." State v. Sexton, 2006 VT 55, ¶ 12, 180 Vt. 34, 904 A.2d 1092 (quotations omitted), overruled on other grounds by State v. Congress, 2014 VT 129, 198 Vt. 241, 114 A.3d 1128.

¶ 8.    "Wantonness is defined as extremely reckless conduct that disregards the probable consequences of taking human lives." State v. Baird, 2017 VT 78, ¶ 13, 205 Vt. 364, 175 A.3d 493 (quotation omitted). "To be convicted of second-degree murder, the defendant must subjectively be aware of the deadly risk to the victim," and "the degree of risk of death or serious bodily injury must be more than a mere unreasonable risk, more even than a high degree of risk." State v. Brunell, 159 Vt. 1, 7-8, 615 A.2d 127, 131 (1992) (quotation omitted). "However, the State need not prove a defendant's mental state directly because we have long recognized that direct evidence of intent is rare; it must be inferred from a person's acts and proved by circumstantial evidence." Baird, 2017 VT 78, ¶ 13 (quotation omitted); see also State v. Derouchie, 140 Vt. 437, 444, 440 A.2d 146, 149 (1981) ("The proper focus of judicial review should be the quality and strength of the evidence, whether direct or circumstantial.").

¶ 9.    According to defendant, in this case the State failed to present any evidence either that he was aware of the deadly degree of risk his actions posed to the victims or that he knowingly disregarded that risk. Defendant acknowledges, however, uncontested witness testimony that on

4

the day of the crashes, he initially entered the interstate going in the proper direction, but then abruptly turned his vehicle around, headed north in the southbound lanes, and, before crashing into the teenagers' vehicle, passed at speeds approaching ninety miles per hour, several drivers who honked horns, flashed lights, or took evasive action. There is also significant evidence, discussed more fully below in addressing defendant's challenge to the sufficiency of the evidence, of the movement of defendant's vehicle into the southbound travel lane as defendant approached the teenagers' car at high speeds in the last few seconds before the crash.

¶ 10.    We conclude that this evidence was sufficient for the jury to find that defendant knowingly disregarded his subjective awareness of the very high risk of death or serious bodily injury that his actions posed to other persons driving on the interstate at that time. When the circumstances are such that the defendant "must have been aware" of his actions, the evidence— whether direct or circumstantial—"is sufficient to raise an inference of knowledge" and "withstand a motion for a judgment of acquittal." State v. Sidway, 139 Vt. 480, 485, 431 A.2d 1237, 1240 (1981) (concluding that proof of impact was sufficient for jury to infer hit-and-run driver's knowledge of injury or damage). "So long as the jury by way of a process of rational inference could conclude beyond a reasonable doubt that defendant committed the acts for which he was charged, we will not disturb the jury's verdict." State v. Godfrey, 2010 VT 29, ¶ 18, 187 Vt. 495, 996 A.2d 237 (quotation omitted); see also State v. Durenleau, 163 Vt. 8, 12, 652 A.2d 981, 983 (1994) (stating that, "[i]n assessing circumstantial evidence, the fact-finder may draw rational inferences to determine whether disputed ultimate facts occurred," and "the State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence" (quotation omitted)). Given the evidence presented at trial, this is not a case in which the jury necessarily relied on conjecture or speculation rather than rational inferences in determining that defendant was subjectively aware of the deadly risk his actions posed to other drivers. See Durenleau, 163 Vt. at 12-13, 652 A.2d at 983 ("The evidence and inferences,

5

however, must add up to more than mere suspicion; the jury cannot bridge evidentiary gaps with speculation.").

¶ 11.  In support of his insufficiency-of-the-evidence argument with respect to intent, defendant asserts that the State's crash reconstructionist acknowledged on cross-examination that defendant's pattern of driving in the seconds before the accident could be consistent with him trying to avoid a collision with another vehicle in the southbound passing lane.  He argues that evidence of evasive action such as this "demonstrates the driver was not indifferent to his or her risk to others."  Cf. People v. Maldonado, 18 N.E.3d 391, 395 (N.Y. 2014) (noting that, in attempting to elude police, "defendant sought to mitigate the consequences of his reckless driving because he actively attempted to avoid hitting other vehicles by swerving, conduct which establishe[d] lack of depraved indifference" required for murder conviction).

¶ 12.  We reject this argument. The crash reconstructionist testified on direct examination that in the seconds before the crash, defendant's vehicle moved from the southbound passing lane into the southbound travel lane and struck the teenagers' vehicle, which had been traveling in the southbound travel lane, near the centerline.  He further testified that the speed of defendant's vehicle increased from almost 80 mph 4.8 seconds [use approximately 79 mph?] before impact to close to 90 mph until just under two seconds before impact, at which point defendant's vehicle began slowing down.  According to the expert, at impact, defendant's vehicle was traveling 78.4 mph, and the teenagers' vehicle was traveling a fraction under 33 mph.  During this 4.8-second period before impact, defendant drove straight ahead in the southbound passing lane for the first 1.5 seconds, at which point his vehicle began moving slightly left into the southbound travel lane, with the vehicle's speed still increasing.  At 2.3 seconds before impact, the speed of defendant's vehicle was still increasing, and the vehicle began angling more sharply toward the travel lane.  At 1.8 seconds, defendant's vehicle moved less sharply to the left, at around 90 mph, and then at 1.3

6

seconds, the vehicle moved sharply to the right and defendant applied the brakes, with impact occurring near the centerline as defendant turned back to the right.

¶ 13. On cross-examination, defense counsel asked the crash reconstructionist if the manner of defendant's steering in the last 4.8 seconds before impact could have indicated he was avoiding another vehicle traveling in the southbound passing lane. The crash reconstructionist answered, "Possibly"; however, there was no evidence that another vehicle had been in the southbound passing lane in the seconds before the crash. Thus, the testimony of the crash reconstructionist provided little support for defendant's suggestion that he took evasive action and did not preclude the jurors from concluding that the State's evidence satisfied the murder intent element.

¶ 14. Defendant also cites testimony by the first police officer at the scene that, in his experience, people drive the wrong way on the interstate for a variety of reasons, including unfamiliarity with the area, language issues, intoxication, or confusion due to age. According to defendant, this shows that driving the wrong way "leads to no inference that a driver was aware of the danger, tha[t] the danger was a risk of probable death, or that the driver intentionally ignored the risk." Again, we reject this argument. While it may be generally true that one cannot always infer wanton disregard based solely on a driver driving the wrong way on a highway, given the circumstances in this case, which go well beyond merely driving in the wrong direction, as described above, a reasonable jury could certainly make that inference here.

¶ 15. Defendant further posits that testimony indicating he kept to the southbound passing lane suggested that he was unaware of the type of highway he was driving on, which he asserts was buttressed by the absence of any testimony of the existence of wrong-way signs or barriers or of any statements by him indicating he knew what type of highway he was on. There was also testimony, however, that defendant did not always remain in the passing lane and that, at least at one point, he moved into the southbound travel lane while driving northbound toward

7

another car. In short, none of the evidence concerning defendant's movements while driving in the wrong direction on the interstate undercuts the jury's reasonable determination that the State presented sufficient evidence to support the murder intent element beyond any reasonable doubt.

¶ 16. Defendant argues, however, that even if the State's evidence supported a reasoned inference of his knowledge of driving or risk-taking, the agreement of the parties' experts concerning his delusional thinking at the time of the crashes rebuts the inference that he intentionally ignored his subjective awareness of a high degree of risk his actions posed to others. Defendant points to statements he made to mental-health evaluators concerning his delusional beliefs around the time of the crashes—that his partner and daughter were being threatened and that he was being recruited by the government to follow instructions he divined from the car radio and other sources. Asserting that the State's expert psychiatrist, Dr. Paul Cotton, agreed that defendant's reported statements were consistent with delusional thinking, defendant argues that uncontradicted testimony acknowledging his reports of delusional thinking was substantial evidence that he did not wantonly disregard the probability that his actions would likely result in serious bodily injury or death to others.

¶ 17. For several reasons, we find this argument unavailing.[1] On direct examination, Dr. Cotton acknowledged that defendant told him during a four-hour evaluation approximately two months after the crash that he was having a variety of "bizarre experiences" when he was driving

---

[1] Given our resolution of this claim of error, we need not decide if part of Dr. Cotton's testimony concerning defendant's delusional thinking should be considered modifying evidence excluded from a sufficiency-of-the-evidence analysis. See State v. Stolte, 2012 VT 12, ¶¶ 11, 13-14, 191 Vt. 600, 44 A.3d 166 (mem.) (defining modifying evidence as testimonial evidence that "raises inherent credibility questions" and is "introduced by the defense in contravention to the State's evidence, the credibility or weight of which is ultimately for the factfinder's determination," as well as disputed nontestimonial evidence); accord State v. Blow, 2020 VT 106, ¶ 16, ___ Vt. ___, ___ A.3d ___ (mem.); see also State v. Breer, 2016 VT 120, ¶ 11, 203 Vt. 649, 160 A.3d 318 (mem.) ("As this Court made clear in Stolte, . . . the true inquiry is whether the new evidence raises a factual dispute more appropriate for the jury to determine.").

around in the week before the accident. Later, in response to questioning about defendant's statements concerning his state of mind at the time of the crashes, Dr. Cotton testified that defendant was able to describe looking into the car he struck, seeing what looked to him like mannequins in the car, running away, and leaving the scene in the police car. Citing the expert's statement in his final report that defendant's reports were consistent with delusional thinking, the prosecutor asked the expert whether in his opinion defendant was delusional. Dr. Cotton responded that defendant's reports were consistent with delusional thoughts, but that the reason he indicated so in his final report was because delusional thoughts happen "when there's a catastrophic event that occurs, that people in the immediate aftermath of the catastrophic event can have a thought that is irrational." When the prosecutor asked if someone with delusional thoughts is different from someone who has [or "with"?] a delusional disorder, Dr. Cotton explained that they are different because the occurrence of a catastrophic event can lead to delusional thinking. Dr. Cotton testified to acknowledging in his draft report the possibility that defendant was suffering from an acute psychotic disorder, given his reports of delusional thinking in the week leading up to the crashes, but he ultimately concluded that "it was more the acute single thought [as the result of the crashes] rather than a mental disease" that led to his diagnosis in his final report.

¶ 18. On cross-examination, Dr. Cotton acknowledged stating in his draft report that defendant's reported thoughts in the week leading up to the crash were "consistent with delusional thoughts," but he emphasized that he made that statement in considering whether there were any "potential" diagnoses that would fit within a recognized mental disorder. Seeking to undercut Dr. Cotton's testimony on direct examination that defendant "had an acute single thought rather than a mental disease," defense counsel got Dr. Cotton to concede that he indicated in his final report that defendant's symptoms, including anxiety, led to "distortions in his thought" and that nowhere in the report did he limit those distortions of thought "to some type of post-traumatic stress for seeing the teenagers down in the car."

9

¶ 19. In sum, Dr. Cotton's testimony regarding defendant's reported delusional thinking focused primarily on defendant's thoughts immediately after the crashes and not on his reported statements in the week leading up to the crash. At most, Dr. Cotton merely acknowledged defendant's reported statements of delusional thinking. In any event, defendant's reports of delusional thinking in the week leading up to the crashes, of which the jury was well aware, did not preclude the jury from determining beyond a reasonable doubt that there was sufficient evidence to satisfy the intent element of the murder charges. The jury was not required to accept as fact defendant's reports of delusional thinking, which were undercut to some extent, apart from any expert testimony, by the testimony of persons who spoke or met with defendant before and after the incident. This includes doctors treating defendant soon after the accident who did not observe any delusional behavior or thinking on defendant's part, as well as by evidence of defendant's normal communications and his whereabouts and activities in the week leading up to the crash.[2] It was within the province of the jury to weigh all the evidence, including the circumstances of the crashes, defendant's reported statements of delusional thinking, the experts' opinions regarding those statements, and the testimony of persons who interacted with defendant during the relevant time period. Given that evidence, a reasonable jury could conclude that the State satisfied the intent element of the murder charges.

¶ 20. Notably, nothing in the record negates the strong circumstantial evidence that at the time of the crash defendant was aware he was driving the wrong way on the interstate at high speeds. As noted, several motorists honked horns, flashed headlights, or swerved out of the way

---

[2] Experts in analyzing electronic data testified to normal communications between defendant and others, as well as inconsistencies between defendant's actual and self-reported movements, in the days leading up to the crashes. Defendant's employer and closest friend did not see signs of psychosis or delusional thinking in his interactions with defendant in the day before the crashes. Psychiatrists at the University of Vermont Medical Center did not see signs of psychosis, delusional thinking, or manic behavior when evaluating defendant in the days after the crashes.

as defendant continued to accelerate in the wrong direction. The fact that he may have been doing so because he believed he was on a government mission or that he was responding to some imagined threat to himself or others, even if believed by the jury, did not preclude the jury from concluding beyond a reasonable doubt that he wantonly disregarded his subjective awareness of the deadly risk his actions posed to other motorists on the highway.

¶ 21. "Evidence offered by a defendant to prove . . . a mental disease or defect may or may not also operate to disprove the existence of mental states, such as intent or premeditation, which might be essential elements of the crime." State v. Messier, 145 Vt. 622, 628, 497 A.2d 740, 743 (1985). For example, if a defendant claimed that his mental disease at the time of the charged homicide "caused him to believe that his homicidal act was commanded by God," that "mental state would not disprove the existence of a specific intent to kill, and so the defendant may be required to prove that he suffered from such a delusion." Id. at 628 n.*, 497 A.2d at 743 n.*; see also Ruffin v. State, 270 S.W.3d 586, 594 (Tex. Crim. App. 2008) (stating that defendant suffering from mental delusion that he was shooting at trespasser rather than police officer might preclude conviction for intentionally shooting at officer but not for intentionally shooting at trespasser). Similarly, in this case, evidence of defendant's delusion that he was on a government mission to protect his family did not preclude the jury from concluding beyond a reasonable doubt that his mental state satisfied the wanton-disregard intent element of second-degree murder.

¶ 22. Finally, with respect to defendant's challenge to the sufficiency of the evidence on intent, defendant argues that the trial court erred when it considered Dr. Cotton's sanity opinion that defendant was aware of the wrongful nature of his conduct and was able to conform his conduct to the requirements of the law. Defendant challenges both the accuracy of the court's recitation of Dr. Cotton's opinion and the relevance of Dr. Cotton's sanity opinion as to whether the State satisfied the requisite intent element.

¶ 23. This argument fails for multiple reasons. First, as noted, we review appeals challenging the sufficiency of the evidence without deference to the trial court.[3] Hence, we "will reappraise the evidence in the record and reach [our] own independent conclusion on the matter." State v. Madison, 163 Vt. 360, 372, 658 A.2d 536, 544 (1995).

¶ 24. Second, defendant's reliance on State v. Webster, is misplaced. 2017 VT 98, 206 Vt. 178, 179 A.3d 149. In that case, unlike the instant case, the defendant, who was convicted of murder, did not pursue an insanity defense at trial. Nevertheless, the State's expert testified on defendant's sanity, to which the defendant unsuccessfully objected on relevancy grounds. On appeal, we rejected the State's argument that the testimony was relevant to the question of whether the State had met its burden of proving the murder intent element, concluding that "the State was attempting to prove an issue that was not contested—[the] defendant's sanity at the time of the offense." Id. ¶ 21.

¶ 25. Here, in contrast, defendant did pursue an insanity defense; thus, Dr. Cotton's testimony regarding defendant's sanity was relevant. On multiple occasions, we have "emphasized the overlap between the insanity defense and the mental elements of specific intent crimes," such as the second-degree-murder charge in this case. State v. Davignon, 152 Vt. 209, 220, 565 A.2d 1301, 1307 (1989) (citing Messier, 145 Vt. at 628-29, 497 A.2d at 743-44); see also Webster, 2017 VT 98, ¶ 20 ("Diminished capacity and insanity are related concepts pertaining to defendant's state of mind at the time of the offense"; however, while defendant must prove affirmative defense of insanity, diminished capacity "is an attempt to defeat the State's obligation to show the necessary intent to commit the crime"). Further, we have concluded that, to the extent

---

[3] We note, however, that the trial court initially denied defendant's motion for judgment of acquittal at the close of the State's case without relying on Dr. Cotton's testimony, concluding that defendant's actions on the interstate in the minutes before the crashes were "certainly sufficient to establish a willful and wanton disregard of the likelihood that death or great bodily harm would result from his actions."

of this overlap, evidence offered under the rubric of an insanity defense "is relevant to prove the existence of a mental defect or obstacle to the presence of a state of mind which is an element of the crime, for example: premeditation or deliberation." State v. Smith, 136 Vt. 520, 527-28, 396 A.2d 126, 130 (1978); see also Messier, 145 Vt. at 628, 497 A.2d at 743 ("[I]n the context of a particular case, the evidence offered to prove insanity may also relate to the defendant's state of mind, which remains an essential element to be proved beyond a reasonable doubt by the State."). In particular, evidence addressing the second prong of the insanity test—whether a defendant had the capacity to appreciate the wrongfulness of his or her conduct and comport that conduct to the requirements of the law—may be relevant to whether the State can prove the intent element of the charged offense. Compare 13 V.S.A. § 4801(a) (setting forth two-prong insanity test that relieves person of responsibility for criminal conduct if person proves by preponderance of evidence that "at the time of such conduct [1] as a result of mental disease or defect [2] he or she lacks adequate capacity either to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law"), with State v. Bruno, 2012 VT 79, ¶ 42, 192 Vt. 515, 60 A.3d 610 (describing "diminished capacity as a mental disability of the defendant at the time of the alleged commission of the offense which precludes or prevents the defendant from forming a specific intent or having the required state of mind which is an essential element of the offense" (quotations omitted)). Indeed, defendant himself argued in his post-trial motion that his "insanity evidence effectively negated the State's evidence as to mens rea," which was insufficient where he "put forth substantial evidence that he was insane at the time of the offenses," thereby negating "any proof the State did offer regarding the mental state elements." Thus, even if we were to take into account the trial court's consideration of Dr. Cotton's testimony regarding defendant's capacity to appreciate the wrongfulness of his conduct, such testimony was relevant in this case.

13

## II. Instruction on Relationship between Insanity and Diminished Capacity

¶ 26. Related to his first claim of error, defendant also argues that the trial court committed plain error by not instructing the jury on its own motion that Dr. Cotton's sanity opinion was irrelevant to defendant's claimed diminished capacity. "Plain error in jury instructions is found only in extraordinary circumstances, when the entire charge undermines our confidence in the verdict and the error affected a substantial right and had an unfair prejudicial impact on the jury's deliberations." State v. Welch, 2020 VT 74, ¶ 8, ___ Vt. ___, ___ A.3d ___ ("We look to four factors in determining whether plain error was committed: (1) there must be an error; (2) the error must be obvious; (3) the error must affect substantial rights and result in prejudice to the defendant; and (4) we must correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." (quotation omitted)). For the reasons stated above, we find no error at all, let alone plain error.

¶ 27. In line with our discussion above, defendant's reliance on Webster for the proposition that the trial court should have instructed the jury to disregard Dr. Cotton's insanity opinion is misplaced. The State never claimed, as defendant suggests on appeal, that Dr. Cotton's ultimate opinion on defendant's sanity was relevant to whether defendant had the requisite intent to commit second-degree murder. Indeed, both defendant in his closing argument, and the trial court in its jury instructions, emphasized the distinction between determining whether defendant was insane and determining whether he had the requisite intent to commit second-degree murder. There is no error.

## III. Dr. Cotton's Testimony Regarding Defense Expert's Diagnosis

¶ 28. Next, defendant argues that the trial court violated Vermont's discovery rules and his due process right to prepare and present a defense by allowing Dr. Cotton to offer a new opinion regarding a defense expert's diagnosis on the eve of Dr. Cotton's testimony after defendant's own

experts had already testified and were no longer available. We find no reversible error, if any error at all.

¶ 29. The following facts underlie defendant's argument. Defendant presented extensive testimony from two forensic psychiatrists, Dr. David Rosmarin on Monday and Tuesday, May 13 and May 14, 2019, and Dr. Reena Kapoor, on Wednesday, May 15, 2019.[4] Both witnesses opined that defendant was insane at the time of the crashes under Vermont's two-prong insanity test. Although both witnesses indicated that they looked to the definition in the American Psychiatric Association's fifth edition of the Diagnostic and Statistical Manual on Mental Disorders (DSM-5) for guidance in determining what constitutes a mental disease, they disagreed on what mental disease defendant suffered from at the time of the incident. Dr. Rosmarin diagnosed defendant with bipolar disorder resulting in psychosis caused by manic episodes, while Dr. Kapoor diagnosed defendant with an unspecified personality disorder having traits of borderline personality disorder and paranoid personality disorder.[5] Both witnesses gave detailed testimony supporting their respective diagnoses and explaining why they disagreed with not only each other's diagnoses but also Dr. Cotton's opinion that defendant was suffering from an adjustment disorder that did not qualify as a mental disease in support of an insanity defense.

¶ 30. Dr. Cotton was scheduled to testify on Friday, May 17 and Monday, May 20, 2019. At the beginning of the May 17 hearing, defense counsel informed the court that the prosecutor

---

[4] Dr. Rosmarin reviewed thousands of pages of documents and interviewed defendant twice, in February and April 2018, between sixteen and eighteen months after the October 2016 incident that led to the charges against defendant. Dr. Kapoor also reviewed a significant amount of materials and interviewed defendant multiple times over roughly thirteen hours in July and August 2018 and January 2019. The State's expert, Dr. Cotton, whom the trial court initially appointed to evaluate defendant's competency to stand trial, examined defendant in December 2016, a few weeks after the incident. The State disclosed Dr. Cotton as an expert witness after Dr. Kapoor, whom the State initially hired to assess defendant's insanity, informed the State that she believed defendant was insane at the time of the crashes.

[5] Dr. Kapoor testified that "unspecified just means that they meet full criteria for a personality disorder but have traits of multiple different ones."

15

had sent him an email the night before informing him, in part, that Dr. Cotton would opine during his testimony that an unspecified personality disorder does not qualify as a mental illness under Vermont's insanity test. Defense counsel stated that in his March 2019 deposition Dr. Cotton did not exclude an unspecified personality disorder as a mental disease, even though he had access to Dr. Kapoor's February 2019 deposition explaining her diagnosis, and that he specifically refused to give any opinions about Dr. Kapoor's diagnosis. Defense counsel acknowledged that both Dr. Rosmarin and Dr. Kapoor opined "that they believed that the unspecified personality disorder was a mental illness for purposes of the [Vermont] statute," but he argued that "they could have expanded on that." Defense counsel reported that he had "actually spoken with both of them" and that "[t]hey ha[d] a lot more to say about that, . . . but we didn't really think it was a contested issue." Defense counsel asserted that the prosecutor's email amounted to a late disclosure.

¶ 31. In response, the prosecutor first challenged the notion that defense counsel had not focused on the first prong of the insanity test when examining the defense experts, noting the extensive testimony, supported by charts, presented by those witnesses the week before. Further, the prosecutor stated that she did not think Dr. Cotton was going "to completely disregard or disagree with [Dr. Kapoor's] diagnosis" and further noted that Dr. Cotton stated "several times" in his deposition, in response to defense counsel's questions about defendant's personality traits, "that personality disorders are longstanding maladaptive traits, and that, to him, is not consistent with a mental disease." The prosecutor also noted Dr. Cotton's repeated statement that experts disagree on what constitutes a mental disease, which is undefined in the Vermont statute, and that it is "up to the professional standards of forensic psychiatry." The prosecutor denied that there was a late disclosure and argued that Dr. Cotton should be able to give his opinion on what qualifies as a mental disease in support of an insanity defense.

¶ 32. Defense counsel pushed back on the prosecutor's claim that Dr. Cotton had stated in his deposition that experts disagreed on what constitutes a mental illness. According to defense

16

counsel, Dr. Cotton responded, "correct," upon being asked if all experts would come up with the same answer when asked to define a mental disease or defect. Defense counsel stated that he took Dr. Cotton's response "to mean he's seen what [Dr. Rosmarin and Dr. Kapoor] said a mental disease or defect [is], [and] we all have the same definition." Noting that he "went through a whole big thing with [Dr. Kapoor] about what the definition is and how [her diagnosis] fit into the definition," defense counsel complained that Dr. Cotton was now saying "something completely opposite [from] what he said in deposition, which is no, we differ about what it is, and mine differs from theirs." In defense counsel's view, that put the first prong "in play, which is completely different than how [they] walked into this trial."

¶ 33. The trial court assessed the state of the evidence as follows: defendant's two experts had different diagnoses as to what mental illness defendant suffered from, but they agreed that both diagnoses qualified as a mental disease and gave extensive testimony in support of their respective diagnoses. The trial court found no late disclosure, concluding that it was merely experts disagreeing and that if Dr. Cotton's testimony turned out to be inconsistent with what he had said in his deposition, defense counsel could impeach him during cross-examination. The court expressed doubt about whether there is a duty to report everything that comes up during the preparation of a witness, but it acknowledged that in this case the prosecutor had contacted defense counsel to report that Dr. Cotton would opine that borderline personality disorder does not qualify as a mental disease in support of an insanity defense. The prosecutor responded that she did so, not because she believed she had a duty to do so under the circumstances, but because defense counsel had emailed her asking her "for every single statement [she'd] ever received or talked to with Dr. Cotton about." She stated that Dr. Cotton's expected testimony that defense counsel sought to exclude was only one of many things she informed defense counsel that she had discussed with Dr. Cotton the day before in preparation for trial.

¶ 34. Defense counsel persisted with his point that he thought Dr. Cotton was going to testify that all experts have the same definition of what constitutes a mental disease. He argued that if he had known Dr. Cotton was going to testify otherwise, his experts would have more expansive answers to the question of what constitutes a mental disease. When defense counsel stated that his experts could not come back to provide more testimony, the court asked why not. Defense counsel responded that Dr. Kapoor "had told us previously that this week was kind of the week she was available. I don't know why she's unavailable. I haven't checked Dr. Rosmarin, but it would be Dr. Kapoor that I would want to come here and to defend her opinion."

¶ 35. When the court stated that Dr. Kapoor had "extensively supported her opinion" by explaining to the jury her diagnosis and "why she believes it constitutes a mental disease or defect," defense counsel responded that he had been unable to ask her to explain why she thought her diagnosis constituted a mental disease "even though people might differ as to that."

¶ 36. The trial court summed up its response to defense counsel's claim of a late disclosure by stating that Dr. Kapoor "extensively covered over and over and over again" in her half-day of testimony the issue of whether her diagnosis supported legal insanity under Vermont law. The court further stated that if Dr. Cotton took a different position at trial from what he said during his deposition, defense counsel could address any inconsistencies during cross-examination and the jury would decide how to weigh the testimony. The court indicated that it saw no discovery violation but told defense counsel "if in fact you wish to recall [Dr. Kapoor] to cover information that you believe was not covered—I think it was covered, but if you think it was not covered, then if you can get your witness back, I'll let you recall her."

¶ 37. Dr. Cotton provided extensive testimony on May 17 and May 20, 2019, during which he ultimately concluded that defendant did not suffer from a mental disease at the time of the crashes and that defendant had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. In response to the prosecutor's query, Dr.

18

Cotton testified that he was aware of Dr. Kapoor's diagnosis of defendant having a borderline personality disorder. When asked if "borderline personality disorder [is] a mental disease as it relates to the insanity defense," Dr. Cotton responded, "It can be." Dr. Cotton explained that it is a "very common disorder" that sometimes "mesh[es] together" with other disorders. He opined that "in and of itself, longstanding maladaptive traits" are "not considered a mental disease." When asked why, Dr. Cotton explained that "it doesn't meet the prong of disorder of thinking or mood so severe that it would impair the individual's capacity to either understand the wrongfulness of their act or conform their conduct to the requirements of the law."

¶ 38.   During cross-examination, Dr. Cotton acknowledged that, unlike statutes in some other states, the Vermont insanity statute does not specifically exclude personality disorders as mental diseases, and that "other forensic psychiatrists and psychologists would disagree with [his] opinion that personality disorders are not mental diseases for purposes of the Vermont statute." When reminded that he had testified on direct examination "that a personality disorder may qualify under certain circumstances as a mental disease," Dr. Cotton stated that "a person can have a personality disorder, and they can develop mental disease that can be defined as a mental disease." On recross, defense counsel asked Dr. Cotton if he recalled saying during his March 2019 deposition that he did not have an opinion about Dr. Kapoor's diagnosis of unspecified personality disorder, which she explained in her February deposition that had been made available to Dr. Cotton. Dr. Cotton responded that he might have said that based on the information he had at the time. When asked whether he "expressed no opinion about [Dr. Kapoor's] opinion in the deposition in March," Dr. Cotton responded, "I guess that is correct."

¶ 39.   Defendant now argues on appeal that, by not prohibiting Dr. Cotton from giving his "new opinion" on whether a borderline personality disorder is a mental disease for purposes of determining insanity, the trial court violated Vermont's discovery rules and his due process right to prepare and present a defense. According to defendant, the court's ruling violated his due

19

process rights by effectively allowing the prosecution greater discovery than that allowed to the defense, thereby permitting "asymmetrical discovery" rather than the reciprocal discovery contemplated by Vermont's discovery rules. See Reporter's Notes, V.R.Cr.P 16 ("This rule must be read with Rules 16.1 and 16.2, which form with it a system of reciprocal discovery.").

¶ 40.    Along the same lines, defendant asserts that the court's admission of the contested testimony violated Vermont Rule of Criminal Procedure 16(a)(2)(C).[6]  That subsection requires the prosecution to disclose to defense counsel and permit inspection and copying or photographing "with[in] a reasonable time" expert "reports or statements . . . made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons."[7]  V.R.Cr.P. 16(a)(2)(C).  He also cites Vermont Rule of Criminal

---

[6] In a slightly different context regarding a claimed violation of Vermont Rule of Criminal Procedure 16(b)(2) concerning the prosecution's duty to disclose exculpatory information, we stated in a prior case that "the constitutional obligation to disclose and the obligation under the criminal rule are identical." State v. Lewis, 151 Vt. 38, 40, 556 A.2d 59, 61 (1988).  Similarly, in this case, defendant's due process and discovery claims of error are essentially the same—that those violations prevented him from being able to prepare and present a defense.

We find unconvincing defendant's reliance on Camp v. Neven, 606 Fed. App'x 322 (9th Cir. 2015), in support of his due process argument.  In that case, the Ninth Circuit concluded that a Nevada statute "imposed a non-reciprocal disclosure obligation" on the defendant, in violation of established U.S. Supreme Court precedent, by requiring both parties to disclose the names and expected testimony of expert witnesses in their case in chief, but not requiring the State to disclose the names or expected testimony of expert witnesses in rebuttal.  Id. at 325-26 (citing Wardius v. Oregon, 412 U.S. 470, 472 (1973), in which U.S. Supreme Court held that rule requiring defendants to disclose details of alibi defense when prosecution was not required to disclose rebuttal witnesses violated criminal defendants' due process rights).  According to the Court in Camp, (1) the prosecution "took strategic advantage of the [Nevada] statute and surprised" the defendant by not notifying him of its expert rebuttal witness; and (2) the defendant was unable to find a sur-rebuttal expert witness within the one-day period allowed by the trial court, thereby effectively depriving the defendant "of a meaningful opportunity to critique" the rebuttal testimony of the State's previously undisclosed expert witness.  Id. at 326.  Putting aside the fact that Vermont's rules require reciprocal discovery, the particular facts of this case present a completely different situation from Camp and concern an expert witness that had been disclosed to defendant.

[7] Another subsection of Rule 16 requires disclosure of "any other material or information not protected from disclosure under subdivision (d) of this rule that is necessary to the preparation of the defense."  V.R.Cr.P. 16(a)(2)(G).

Procedure 12.1(d), which requires both defense counsel and the prosecutor, upon the defense's notice of an insanity defense, to be under a "continuing duty to disclose promptly the names and addresses of additional witnesses which come to the attention of either party subsequent to" notice of that defense.[8] Defendant asserts the disclosure of Dr. Cotton's "new opinion" on the eve of his testimony was untimely, given the trial court's pretrial discovery and scheduling orders, including orders requiring Dr. Cotton's deposition by March 2019 and scheduling a trial for mid-May 2019.

¶ 41. Finally, defendant argues that the discovery and due process violations were prejudicial because the issues of his sanity and intent were highly contested at trial, as evidenced by the experts' extensive testimony concerning those issues.[9] According to defendant, the prosecution's late disclosure prevented Dr. Kapoor from having an opportunity to refute Dr. Cotton's "new opinion" that her diagnosis of borderline personality disorder did not qualify as a mental illness in support of an insanity defense.

¶ 42. As an initial matter, our ability to assess this claim of a discovery violation and resulting prejudice is hampered by the absence in the record of Dr. Cotton's deposition or of the State's previous disclosures concerning his expected testimony. The record shows, however, as detailed above, that: (1) coming into trial, all parties were aware that the two defense experts and the State's expert had each provided different diagnoses of defendant and that Dr. Cotton did not agree with defense experts that defendant was insane as defined in Vermont law; (2) each of the

---

[8] Vermont Rule of Criminal Procedure 16.2(b) requires parties who discover "additional material or information which is subject to disclosure" to "promptly notify the other party or that party's attorney of the existence of such additional material, and if the additional material or information is discovered during the trial, the court shall also be notified."

[9] Dr. Kapoor, who ultimately concluded that defendant was insane at the time of the crashes, testified on cross-examination, that it was a difficult case for her, not only because of the tragic events involved, but because there was "a credible alternate theory of what happened" other than that defendant was delusional and insane—namely, "that he was under stress, depressed, suicidal [and] decided to crash his car in a sort of suicide-homicide attempt, and then, when he didn't die, had to make up a story to get himself out of trouble."

21

experts testified extensively in support of their particular diagnosis and relied upon the general definition of mental disease in the DSM-5 in evaluating whether that diagnosis was a mental disease with respect to an insanity defense; (3) each expert explained why they believed their diagnosis was correct and the other experts' diagnoses were incorrect; (4) on the morning Dr. Cotton was to testify for the State in rebuttal, after defendants' experts had already testified, defense counsel informed the trial court that the prosecutor had sent him an email the night before letting him know that Dr. Cotton would testify, in relevant part, that an unspecified personality disorder does not qualify as a mental disease; (5) defense counsel objected to the proffered testimony, stating that Dr. Cotton had inconsistently testified at his deposition that all experts agreed on the definition of mental disease; (6) defense counsel told the trial court that, had he known of Dr. Cotton's late disclosure, he would have asked Dr. Kapoor why she believed that her diagnosis qualified as a mental disease even though other experts might disagree; (7) in response to the trial court's query, defense counsel stated that he did not know why Dr. Kapoor was unavailable but that "she had told us previously that this week was kind of the week she was available"; (8) the trial court allowed Dr. Cotton's proffered testimony, with the caveat that, in addition to defense counsel having the opportunity to impeach Dr. Cotton on cross-examination with any inconsistent deposition testimony, the court would allow defense counsel to recall Dr. Kapoor to testify further in response to Dr. Cotton's testimony; (9) during direct examination, Dr. Cotton testified that borderline personality disorder is a common disorder that can be considered a mental disease in support of an insanity defense when combined with other mental diseases, but that by themselves, maladaptive traits "are not considered a mental disease"; (10) Dr. Cotton acknowledged during cross-examination that other forensic psychiatrists would disagree with his opinion that personality disorders generally do not qualify as a mental disease in support of an insanity defense; (11) Dr. Cotton also acknowledged during cross-examination that he had expressed no opinion at his March 2019 deposition on Dr. Kapoor's diagnosis; and (12) following

22

cross-examination of Dr. Cotton, defense counsel did not seek a continuance to recall Dr. Kapoor or offer any further explanation as to why Dr. Kapoor would not be available to provide further testimony in response to Dr. Cotton's testimony.

¶ 43.    Under these circumstances, we decline to reverse defendant's murder convictions based on his challenge to the trial court's discretionary ruling allowing Dr. Cotton to give his opinion in rebuttal on whether a border personality disorder, standing alone, is a mental disease that can support an insanity defense.  Cf. State v. Miller, 146 Vt. 164, 173-75, 502 A.2d 832, 838-39 (1985) (finding that trial court did not abuse its discretion in allowing State's witness to give inculpatory testimony, subject to defense counsel being allowed to cross-examine witness and recall him later, that was provided to defense counsel two days earlier when prosecution became aware of it and that directly conflicted with witness's deposition testimony given two weeks before trial).  To the extent there was a discovery violation, a question we need not decide, defendant has failed to show any meaningful prejudice.  See State v. Jones, 160 Vt. 440, 446, 631 A.2d 840, 845 (1993) ("To establish reversible error under V.R.Cr.P. 16, a defendant must show both a violation of the rule and resulting prejudice."); see also State v. Provost, 2005 VT 134, ¶ 11, 179 Vt. 337, 896 A.2d 55 ("In addition to showing a rule violation, the defendant still must demonstrate that the violation prejudiced his defense in some meaningful manner to justify relief." (quotation omitted)).  Defense counsel was able to cross-examine Dr. Cotton on his nuanced opinion concerning Dr. Kapoor's diagnosis and to elicit Dr. Cotton's recognition that other experts would disagree with his conclusion that Dr. Kapoor's diagnosis does not quality as a mental disease in support of an insanity defense.  Following that cross-examination, defense counsel neither sought a continuance to recall Dr. Kapoor to present additional expert testimony on this issue nor explained why Dr. Kapoor was unavailable to present any needed testimony.  Nor did defense counsel make a specific proffer as to what Dr. Kapoor would say if she were given an opportunity to respond to Dr. Cotton's alleged new opinion.

23

IV. Defendant's Request for a Mistrial

¶ 44.    We now turn to defendant's argument that the trial court abused its discretion by not granting him a mistrial after the testimony of a defense witness, defendant's former intimate partner, revealed that the prosecution had failed to disclose statements the witness had made to the prosecution.    In particular, defendant cites one allegedly highly prejudicial statement that the witness made during pretrial discussions with the prosecution.    Because the trial court's "disposition of a motion for mistrial is discretionary," defendant's "claim of error can be supported only where the trial court's discretion was either totally withheld, or exercised on clearly untenable or unreasonable grounds."  State v. Messier, 2005 VT 98, ¶ 15, 178 Vt. 412, 885 A.2d 193.

¶ 45.    Defendant's former partner, with whom defendant had a child, was initially listed as a State witness, but after the State decided not to call her as a witness in its case-in-chief,[10] defendant made a tactical choice to call her as a witness.  At the conclusion of the prosecutor's cross-examination of the witness on Friday, May 10, 2019, the prosecutor asked the witness if she had ever spoken to defendant about what happened on the night of the crashes.  The witness responded, "Not really, no."  The prosecutor then asked the witness: "[I]s it correct that the only thing he's ever really told you about what happened on October 8th, 2016 [was] that there were no 'wrong way' signs on the highway."  The witness responded, "Correct."  Defense counsel did not object to either question.

¶ 46.    On the following Monday morning before the trial recommenced, defense counsel moved for a mistrial, alleging that the prosecution had elicited inculpatory and prejudicial testimony from the witness, the most prejudicial being the witness's testimony that "at some unspecified time after the crash" defendant told her that there were no wrong-way signs on the highway.  Defense counsel stated that he learned from the prosecutor over the weekend that the

_____

[10]  The trial court had reserved its decision on whether it would allow the State to call the witness in rebuttal.

24

witness had met with the prosecutor twice prior to trial—the first time was a seventy-five-minute interview that was audio-recorded, and the second time was an unrecorded conversation, during which the witness informed the prosecution that defendant told her there were no wrong-way signs on the highway on the day of the crashes. Defense counsel alleged that the discovery violation was highly prejudicial because the "case hinges on Defendant's mental state at the time of the offense and, more importantly, on his veracity in describing that mental state to witnesses and forensic examiners." Defense counsel noted that after the crashes defendant spoke to the witness only during recorded jail calls and that the discovery violation prevented him from investigating those communications to verify the witness's report of what defendant told her. He also argued that the way? in which the prosecutor elicited the statement from the witness prevented defendant from having an opportunity to object to the testimony.

¶ 47. The prosecutor responded that the seventy-five-minute recorded interview was conducted on January 23, 2019, at the request of Dr. Kapoor, who at the time was still working on behalf of the State, so that she could better understand the witness's relationship with defendant and certain aspects of his personality. The prosecutor stated that she sent the recording not only to Dr. Kapoor, but also to the public defender's office. As for the second contact with the witness, the prosecutor stated that she and her co-counsel met with the witness in late February 2019 to discuss the witness's deposition scheduled for March 11, 2019. She further stated that she was sure she orally mentioned the witness's report of defendant's no-wrong-way-signs statement to defense counsel or his co-counsel during another deposition. She also noted that on the morning of the witness's scheduled deposition, defense counsel canceled the deposition, and that in mid-April defense counsel notified the State that it intended to call defendant's former partner as a witness.

¶ 48. In his reply to the State's response, defense counsel stated that, after speaking to staff and examining office records, he was confident that the State neither disclosed the witness's report of defendant's statement nor sent his office a copy of the seventy-five-minute interview.

¶ 49. Before trial testimony resumed on the morning of May 13, the trial court and the attorneys engaged in a lengthy discussion concerning defendant's motion for a mistrial. The prosecutor expressed her certainty that she had disclosed to the defense her communications with the witness; defense counsel was equally certain that the prosecution failed to disclose the communications. At one point, the court asked defense counsel to contact Dr. Kapoor to confirm whether she had received the recorded interview from the State, and defense counsel later informed the court that Dr. Kapoor confirmed that the State had in fact sent Dr. Kapoor the interview and that it had no impact on her opinion regarding defendant's insanity. When the court questioned defense counsel's decision to cancel the witness's deposition even though he had decided to call her as a witness, defense counsel emphasized that he made tactical decisions to cancel the deposition and call her as a witness but that he would not have canceled the deposition if the prosecution had revealed its prior communications with the witness.

¶ 50. Following the discussion, the trial court denied the motion. The court first stated that there was no indication of bad faith on the part of the State,[11] but that it would give the defense the benefit of the doubt and assume that there was a discovery violation because it was confronted

---

[11] We do not interpret the trial court noting no indication of bad faith as suggesting that there can be no discovery or due process violation absent a finding of bad faith. See Provost, 2005 VT 134, ¶ 11 (stating, in response to defendant's claim that trial court erred by permitting undisclosed testimony, that to obtain relief defendant needed to show "a rule violation" and "that the violation prejudiced his defense in some meaningful manner" (quotation omitted)); see also State v. Delisle, 162 Vt. 293, 310, 648 A.2d 632, 642-43 (1994) (concluding in case involving lost evidence that federal due process standard "is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant"). Indeed, despite noting no indication of bad faith, the trial court assumed that there was a discovery violation here and considered the extent to which defendant had been prejudiced by the violation.

26

with a situation where credible attorneys on both sides disputed whether the prosecution had disclosed the witness's communications.

¶ 51. The court then turned to the question of prejudice. After noting that defense counsel had not objected to the witness's testimony, the court expressed doubt that defense counsel's knowledge in advance of trial to defendant's comment to the witness would have affected his decision to call defendant's former partner as a witness, given the defense theory. The court then indicated that it could cure defendant's assertion that he would have handled the witness differently if he had known of her report of defendant's no-wrong-way-signs statement. The court stated that it would order the Department of Corrections to make available to the defense all recorded conversations between the witness and defendant and would allow defendant to recall the witness and impeach her with any information obtained from those conversations. Finally, the court noted that the challenged statement could have been discovered by the defense with a reasonable amount of due diligence by deposing the witness or vetting her before presenting her testimony.

¶ 52. In response to the court's ruling, defense counsel requested an alternate remedy— that the witness's testimony regarding defendant saying he did not see any wrong-way signs be stricken from the record and that it not be commented on for the remainder of the trial. Both attorneys then agreed that the court should (1) instruct the jury to disregard and not consider as evidence the witness's acknowledgment that defendant told her he saw no wrong-way signs on the night of the crashes, and (2) not permit the attorneys or witnesses to refer to that testimony for the remainder of the trial. When the jury was called in, the court gave the instruction agreed upon, and neither party referred to the witness's brief testimony thereafter.

¶ 53. Defendant argues on appeal that the court's instruction was insufficient to cure the prejudice resulting from her testimony, which he claims directly undercut his insanity defense. Specifically, defendant contends that the testimony undercut his report to psychiatric evaluators that he did not remember anything leading up to the collision, which Dr. Kapoor testified was

27

"fairly consistent with psychosis for people not to have very clear memories when there's . . . an acute psychotic case." We disagree that the jury could not follow the court's curative instruction under the circumstances of this case.

¶ 54.    Generally, "when reviewing the sufficiency of a curative instruction, in the absence of evidence to the contrary, this Court will presume that the jury has heeded the instruction and disregarded the improper remark." Messier, 2005 VT 98, ¶ 15. To be sure, there are circumstances when the potential prejudice of improperly admitted testimony would be too great to rely on this presumption, but such circumstances do not exist here. See State v. Sarkisian-Kennedy, 2020 VT 6, ¶ 36, ___ Vt. ___, 227 A.3d 1007 (stating that we will abandon this presumption, which "is fundamental to our jury trial system," only when "presented with 'an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant' " (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987))); see also Messier, 2005 VT 98, ¶ 15 (emphasizing that reversal of trial court's refusal to grant mistrial is "appropriate only when the moving party demonstrates prejudice, which must be determined according to the facts of each case in the context of the entire proceeding").

¶ 55.    Defendant exaggerates the potential prejudicial impact of the witness's one-word acknowledgment that, at some unspecified time after the crashes, defendant told her he did not see any wrong-way signs at the time of the incident. The fact that defendant's former partner testified that defendant made this comment to her days, weeks, or months after he had been hospitalized following the crashes did not significantly undercut the extensive expert testimony in support of his insanity defense, such that the jury could not comply with the court's curative instruction. The court's instruction was "clear and straightforward" and was given to the jury immediately after the court considered defendant's motion for a mistrial, which was filed that morning.[12] Sarkisian-

---

[12] The delay over the weekend in the court giving the instruction, notwithstanding defense counsel's assertion that he wanted to confirm that the prosecution had never disclosed the witness's

28

Kennedy, 2020 VT 6, ¶ 37 (citing "hallmarks of an effective limiting instruction"). We conclude that the trial court appropriately exercised its discretion under the circumstances in denying the motion for a mistrial by instructing the jury to disregard the challenged testimony and not consider it as evidence.

Affirmed.

FOR THE COURT:

_____

Associate Justice

---

communications with defendant to him, was the result of defense counsel's failure to object to the testimony. Notably, immediately after the witness gave the challenged testimony, defense counsel examined the witness on redirect on different subjects and then called other defense witnesses. Nothing in the record indicates that either party referred to the witness's brief testimony acknowledging the no-wrong-way-signs statement that defendant allegedly made to her.